**In the Matter of R\_\_\_\_\_ E\_\_\_\_\_ W\_\_\_\_\_, Appellant.**

No. 16786.

Court of Civil Appeals of Texas, Houston (1st Dist.).

Dec. 30, 1976.

Rehearing Denied Jan. 27, 1977.

574

Nicolas R. Serna, Houston, for appellant.

John L. Hill, Atty. Gen., David M. Kendall, Colin J. Carl, Frank C. Cooksey, Asst. Attys. Gen., Austin, for appellee.

EVANS, Justice.

This is an appeal from a judgment of the Juvenile Court, terminating the parent-child relationship between Dorothy Mae Woods and her child Rebecca E. Woods and naming the Harris County Child Welfare Unit as the managing conservator for the child.

In her first three points of error Mrs. Woods questions the constitutionality of the emergency sections of the Texas Family Code which authorize juvenile probation and law enforcement officers and authorized representatives of the State Department of Public Welfare to take possession of a child without notice, "to protect him from an immediate danger to his physical safety" and which set forth procedures for the issuance of temporary orders for the care and protection of the child. Chapters 11 and 17, Texas Family Code.

Mrs. Woods contends that on January 21, 1976, after she had had an argument with the Harris County Child Welfare Unit worker assigned to the case, the Welfare Unit, without prior notice, picked up her child Rebecca, at the nursery school her child was attending. That same date a petition was filed by the Welfare Unit in Juvenile Court, requesting termination of the parent-child relationship between Mrs. Woods and her child Rebecca, and an order was thereupon entered by the Juvenile Court setting a show cause hearing on the temporary conservatorship for February 2, 1976. The order also designated that a final hearing on the termination petition would be held on April 5, 1976, but that hearing was postponed until April 29, 1976, when the court entered the order from which this appeal is taken.

Mrs. Wood contends that the statutory scheme evidenced by the Family Code is unconstitutionally vague in that the Code provisions fail to define with sufficient particularity the grounds upon which immediate custody of the child is justified and upon whose determination such action may be authorized. She argues that an emergency possession of a child under Chapter 17 of the Code, in effect, deprives the parent of a constitutional right to an immediate hearing, and as a practical result, the parent is painfully separated from the child for a lengthy and indefinite period.

■ Mrs. Woods concedes that she received notice from the Welfare Unit that her daughter Rebecca had been taken into custody and that she was notified of the show cause hearing. An appeal could have been taken from the emergency order, even though the appeal would not have stayed the order. Section 17.07, Tex. Family Code. Although serious questions as to the constitutionality of the statute have been raised, it has not been shown that any harm or prejudice was caused to Mrs. Woods in her defense of the State's petition for termination. Any question relating to the temporary custody of the child was rendered moot upon the rendition of a final judgment in the case terminating the parent-child relationship. *City of Corpus Christi v. Cartwright*, 281 S.W.2d 343 (Tex.Civ.App.—San Antonio 1955, no writ); *McNeill v. Hubert*, 119 Tex. 18, 23 S.W.2d 331, 333 (1930). The first three points of error are overruled.

Mrs. Woods' fourth point of error, which must be sustained, is that the State failed to meet its burden of proof and that the evidence does not support the trial court's judgment terminating the parent-child relationship.

The testimony established that Rebecca Woods was born on July 26, 1971, and that her case had first been referred to the Harris County Child Welfare Unit in Sep-

tember 1971 when she was approximately two months old. The child apparently remained in the custody of her mother, Mrs. Woods, until June or July 1972 when Mrs. Woods was voluntarily hospitalized for treatment of alcoholism. The child was under the care of Child Welfare until November 1972 when she was returned to the custody of her mother.

Patricia Leger, an employee of the Harris County Child Welfare Unit, testified that she had been assigned to the Rebecca Woods case in November 1972 and that she handled the case until July 1973. She testified that Mrs. Woods lived in a small one bedroom rent house which has a kitchen, living room, bedroom, and bathroom. There were many rent houses in a row, very close together, and the rental was $10.00 to $12.00 per week. The house was situated in a high-crime area. Mrs. Woods kept piles of clothing about the house and there were also used, filthy rags which appeared to be gasoline or turpentine soaked. Mrs. Woods claimed she was painting and needed to have the rags for that purpose. In the kitchen were piles of garbage, edible food which had rotted and was covered with fungus and roaches, a "sea of roaches". Mrs. Leger set up a plan with Mrs. Woods whereby visiting nurses and a homemaker came into the house. The homemaker would stay the better part of the day and would tell Mrs. Woods about nutrition and how to clean. Mrs. Leger also worked with Mrs. Woods but had difficulty making her understand how the garbage and clutter in the house constituted a health hazard. Rebecca was a small framed, very skinny child; her stomach was distended and her limbs were tiny. She was behind in her development, unable to walk and required special high-topped shoes. Mrs. Woods did not feed Rebecca solid foods, but kept her on a bottle because that was easier. "Rebecca constantly had a bottom that can only be described as scalded. She did not change her frequently and her diaper was urine soaked or worse, and the baby's buttocks were actually raw . . . sometime oozing, it was so raw and I worked with her on changing the child· more frequently and

taking better care, and she was also filthy and the baby was filthy." Mrs. Woods was receiving psychiatric counselling and saw a psychiatrist at least every other week. In July 1973 Mrs. Woods became emotionally disturbed to the extent that she was hospitalized in the Austin State Hospital for about three months. During this time Child Welfare again assumed the care and custody of the child. Mrs. Leger assisted in her admission to the hospital and afterward had no further contact with the case. Mrs. Leger described Mrs. Woods as resourceful, manipulative and really likable; she had no family to help her and no transportation. Mrs. Woods expressed love for Rebecca and Mrs. Leger's concern was that Mrs. Woods seemed unable to protect the child from the filth of her living conditions and also that Mrs. Woods kept a loaded gun and medicine bottles within reach of the child. She also failed to feed the child correctly. The reason that Rebecca was returned to her home after Mrs. Woods was discharged from Austin State Hospital was that there seemed to be an improvement on the part of Mrs. Woods.

Dr. Marie L. Surgi, a pediatrician employed by Harris County Child Welfare, had examined Rebecca on three occasions, the first in October 1974. Rebecca was a very slender child, somewhat undernourished. She was then 3½ years old and had a slight heart murmur. She had very poor balance, could not hop or jump or walk in a relatively straight line. She was sent to Mental Health/Mental Retardation therapeutic nursery to improve her mental and physical development. Dr. Surgi saw Rebecca again about a year later. Rebecca was then going to Head Start in the morning and to the therapeutic nursery in the afternoon, and a counsellor was seeing the mother and child once a week. Rebecca was brought in to see Dr. Surgi for possible malnutrition, because she was so thin. She had gained considerably since the first visit, but she was tall, still thin and her muscles were extremely flabby. Dr. Surgi made note that the child showed no great neglect, but that she was underweight which could be

due to insufficient food. Dr. Surgi also noted that Rebecca had improved a great deal in her motor skills and, to some extent, in her social skills. About two and a half months later, in January 1976, Dr. Surgi again examined Rebecca. Rebecca had gained a couple of pounds, but was still a very thin looking child. Dr. Surgi noted that Rebecca was very potbellied and that she had a flatulent abdomen with weak abdominal muscles frequently considered to be the result of poor nutrition. Rebecca's color was good but her skin was extremely dry; her clothing clean but ragged. Dr. Surgi had not ever talked to Mrs. Woods. She noted, however, that the child loved her mother and that the mother apparently loved the child.

Judy Albracht, an employee of Harris County Child Welfare Unit, was assigned to the case from September 19, 1975, until the show cause hearing on February 5, 1976. Mrs. Albracht testified she first went to Mrs. Woods' home on a report that the child had been whipped for faking an illness. She observed that the apartment was very dirty, very cluttered, and had an odor similar to that of an animal cage. The floor had visible dirt, peanut shells and other debris, and the kitchen table was full of bottles and boxes. She testified that Mrs. Woods denied any physical abuse of the child and claimed that the child would scream when she, Mrs. Woods, was not even in the room. Mrs. Albracht testified that she observed three large sores on Rebecca's left thigh and that it appeared to be swollen. Approximately one week later Mrs. Albracht again went to Mrs. Woods' home. She noticed that the kitchen table was filled with food and garbage; there was a large garbage bag next to the table which was full and the counter, sink and stove were piled about a foot high with used dishes, pots, leftover food and garbage. The floor had dirt and spills rubbed into the linoleum and there were roaches and fleas. The hallway was loaded; the living room was full of clothes and the coffee table was filled as high as it would go with medicine, food, papers and trash. The bathroom and bedroom were relatively uncluttered at that time. She said Mrs. Woods seemed aware of the problem and apologized for the condition of the house. At Mrs. Albracht's suggestion a homemaker began working with Mrs. Woods in October 1975, and the homemaker went to Mrs. Woods' house about twice a month. However, as one room would get clean, another would become cluttered, and Mrs. Woods said that she could not keep it clean. Mrs. Woods told her she was too ill to clean the house and admitted that she was not cooking for the child. She said Rebecca usually ate downstairs at a neighbor's apartment. Mrs. Woods and Rebecca slept in the same bed, and Mrs. Woods kept their nightgowns tied together at night so that the child could not wander through the apartment. Mrs. Albracht was later able to get Rebecca into her own room. Mrs. Albracht testified that Rebecca was picked up by Child Welfare for two reasons, the first being the condition of the house and the care the child was getting at home, and the second being that the Mental Health worker who had been working with Rebecca observed that the child had regressed quite a bit during the three weeks she had been at home over the Christmas vacation. During the time that Mrs. Albracht remained on the case Rebecca was sometimes clean and sometimes pretty dirty. Her most observable problem was a very dry skin and the fact that she was so thin. Mrs. Albracht denied any personality conflict between herself and Mrs. Woods.

Mr. Robert Guidry, the psychiatric social worker at Children's Mental Health Services, had seen Rebecca and Mrs. Woods on four occasions in his office. His function was to provide parental counselling to Mrs. Woods. On their first visit he noted that Mrs. Woods' manner of relating to Rebecca was harsh and scolding. "I saw very little of the tenderness I would expect of a mother to have in dealing with her child." In subsequent interviews he noted considerable physical contact between the mother and the child. Both seemed very aggressive in their interaction. During therapeutic exercises in which the child was suppos-

578

ed to take the lead, Mrs. Woods seemed unable to adopt a passive attitude and became aggressive in her conduct. Mr. Guidry stated that he made some progress in his four interviews but that he considered the progress to be minimal.

Mrs. Jill Fein, a therapist at the therapeutic nursery, had worked with Rebecca since she had been admitted in the nursery in November 1974. She said when she first saw Rebecca it did not appear that Rebecca had had any social activity. Rebecca did not know how to display affection or sit at a table and eat; at snack time she would take a handful of cookies and stuff them down. Rebecca was very thin, had sores on her body, very thin hair and often had diarrhea. She always seemed to have a cold, and her clothes were dirty and tattered. Mrs. Fein testified that Rebecca had made a lot of progress in almost every area since she had been with the nursery. She had gained weight and her speech was better. When she had first come there she hadn't talked at all, but now she is talking more. At first Rebecca couldn't walk in a straight line and was always falling down; now she can run much better and can swing. She can display appropriate affection. Mrs. Fein noticed that when Rebecca returned to the nursery after the three week period at Christmas which she had spent with her mother, her behavior had regressed and she was again very aggressive. She was biting and hitting the other children. She would hug the workers and would then begin to shake them and try to hurt them. She seemed hyperactive, had a short attention span and ran around the room knocking down all the toys. She began doing bizarre things like sticking her head in the toilet as she had previously done. Since January 1976 Rebecca had been in a foster home under the custody of the Child Welfare Unit. She appeared somewhat cleaner since she had been in the foster home, but there does not seem to be much difference in her emotional condition or in her relation with the other children. On cross-examination Mrs. Fein admitted that Rebecca had stated: "I want to go home with my Mama and stay there all day."

Nicki Kuhn, a social worker at Harris County Child Welfare Unit, who had been assigned to the case since February 1976, recommended termination of the parental relationship. She had made one visit to Mrs. Woods' house. She stated that Mrs. Woods had said that she wanted Rebecca back with her and that she would continue to have Rebecca go to the therapeutic nursery. When asked about her living situation Mrs. Woods stated that she wanted to move; she wanted to move because she didn't get along with her neighbors.

Mrs. Woods testified on her own behalf. She is 39 years old and has not been able to work due to a heart condition and other ailments. She had not worked for the past ten years. She is receiving welfare payments of $61.50 per month and $50.00 for food stamps. When Rebecca was with her, she was receiving $86.00 per month and $90.00 for food stamps. She then also received $44.00 for rent. She testified that she had gone to the ninth grade. When she had placed herself with the Texas Research Institute of Mental Sciences as an alcoholic, she had been sent to sewing school. She is able to keep up the house, but if she does too much she has to stop and rest. She is a widow and has been an alcoholic since she was 16 years old. She no longer drinks and cannot stand the smell of liquor. On school mornings she had waked Rebecca up at six in the morning, bathed her and fed her cereal or grits, eggs and bacon for breakfast. The school bus came between 8 and 8:30 in time to get Rebecca to school at 9 o'clock. Rebecca ate lunch at school and at 1:15 was picked up to go to the therapeutic nursery school. She stayed there until 3:30 and then was returned home by bus. Mrs. Woods said that Rebecca had a tendency to injure herself; that when another child hit her she would not fight back, and instead would reach up and rake herself across the face, cheeks or legs. "She would scratch herself and I knew it wasn't normal for a child to maul herself like this and I told Dr. Androes the way she was acting, and I

don't know the organization, but they sent me out a bunch of papers to fill out, and I filled them out and mailed them in, and sooner or later she was accepted in Children's Mental Health." Mrs. Woods admitted that the first time Rebecca had gone to the hospital, she had suffered from malnutrition. She said that Rebecca would eat enough but that even so, she failed to gain weight. She said she asked the doctor why Rebecca didn't gain weight and he said it was only normal, but that she, Mrs. Woods, knew that it wasn't. She testified that on the day Rebecca had been picked up by Child Welfare, Mrs. Albracht had told her "to shut my damn mouth and subconsciously I did not love my baby, and I asked her who she to play God, that she didn't know what was in my mind and heart and she had no right to talk to me in my home." She testified she could never please Mrs. Albracht; that there was nothing she could do to satisfy her and Mrs. Albracht wanted her to see a psychiatrist and she had agreed to see one but that Mrs. Albracht never set up an appointment. Mrs. Woods testified that there was mention made of her child being put up for adoption when she went to the Children's Mental Health Clinic. She testified that she had wanted to cooperate with Child Welfare and to satisfy Mrs. Albracht because she knew she had the upper hand but that "the more I tried to satisfy her, the rougher she got on me. And I mean she came down hard on me." She testified that she had worked easily with previous Welfare workers "because they knew I wanted to learn, but she came in there and was jumping down my throat as soon as she came in." She stated that she loved Rebecca very much and that she was capable of taking care of her. She takes Darvon for headaches, and Vallium for her nerves; she takes these drugs not for a nervous condition but due to her alcoholic condition. She testified that if she can get up in the morning and take something without having the shakes, she can make it. She has been "on the wagon" about three or four years and is proud of this accomplishment.

Mrs. Joyce Harris, a licensed vocational nurse and a friend and neighbor of Mrs. Woods, testified that Mrs. Woods was capable of taking care of children and took care of her two boys, twelve and nine years of age, five days a week when she worked. She said her children enjoyed staying with Mrs. Woods; that they didn't want to come home. She said when Mrs. Woods wasn't feeling well her house was junky, but when she felt good the house looked nice. She said Mrs. Woods can only do a certain amount before she has to sit down and rest due to her heart condition. She testified that, in her opinion, Mrs. Woods was physically able to care for an active five year old child.

Mrs. Dolly Ann Williams, the sister of Mrs. Joyce Harris, lives in an apartment downstairs from Mrs. Woods. She said Mrs. Woods' apartment was clean except that she keeps her clothes folded up and in a box since she doesn't have a place to put them. She said Mrs. Woods had kept her children and that her children enjoyed staying with Mrs. Woods. She believed Mrs. Woods to be capable of caring for the children and capable of taking care of Rebecca. She said she did not recall the exact date, but that she was coming upstairs and just as she got to the top stairs she heard Mrs. Albracht say to Mrs. Woods, "Damn it, shut your mouth and wait until I tell you to speak and then you speak."

Dr. Leroy Androes, a psychiatrist, had known Mrs. Woods eight or nine years. He testified that she had been in an alcoholic program at the Texas Research Institute of Mental Sciences and that he had first known Mrs. Woods there. Dr. Androes testified that he had hospitalized Mrs. Woods on several occasions, that she had received treatment for alcoholism and had successfully stopped drinking and motivated herself to come into therapy. After the research program at TRIMS closed, Dr. Androes continued to see Mrs. Woods at Ben Taub Hospital and she continued therapy under his direction for a number of years. Dr. Androes stated that in his opinion Mrs. Woods had done very well in controlling her

alcoholic problem. She had made a great effort to straighten out her life. In watching her testify as a witness, he noted that she had asserted much greater control over herself than she would have been able to do at the time he first knew her. He felt she had responded to treatment and that she was capable of taking care of children even though she was not capable of physical work or holding down a job. In his opinion, Mrs. Woods had the capability of caring for her child even though on several occasions she had required hospitalization and had then been unable to care for the child. His observations indicated that Mrs. Woods loved her child without qualification and that she was relating well with the child. Dr. Androes stated that the communication patterns of blacks were different from whites and that Mrs. Woods had communicated in what amounted to her black language. As a pattern of speech, Mrs. Woods used some aggressive terms, but these were used in "kind of a loving way." Dr. Androes testified that he had done psychotherapy with other blacks and that while their communication might seem strange to a white person, he had learned that "it was kind of a loving way that they talked to each other." He stated that on visits to his office, Rebecca was clean, considering that she came from a low economic environment and that her dresses were simple but as clean as you might expect. He was permitted to give his opinion, based upon his long observations of Mrs. Woods and her child that he did not believe it would be to the best interest of the child and the mother to have the mother's parental rights terminated. Dr. Androes testified that in his opinion Mrs. Woods was capable of bringing up her child properly. He stated that black culture was not the same as whites' and that Mrs. Woods' child rearing practices indicated a great deal of black culture. He testified that he could work with Mrs. Woods, Rebecca and the Child Welfare workers; that in his opinion the situation would improve. He testified that medical conditions might exist to make Rebecca appear to be malnourished when nutrition may not have had anything to do with her condition. Dr. Androes testified that he had not been compensated for recent treatment of Mrs. Woods and that his court appearance was without compensation. He testified that Mrs. Woods was being treated for anxiety and depression but that she did not have psychosis. On the question of Rebecca's regression after her return to the therapeutic nursery program following the Christmas holidays, Dr. Androes testified that regression was not necessarily a permanent change and that after several weeks children would become reorganized and "back in harness." Dr. Androes concluded his testimony with the opinion that Mrs. Woods was capable of providing stability in the environmental care of her child.

The testimony depicts a mother who is attempting to rear her child under extremely difficult circumstances. She is admittedly an imperfect parent and an ineffective housekeeper. She is an alcoholic with related emotional difficulties, causing periods of anxiety and depression. She has become reliant on drugs to maintain a day to day sense of stability. She is alone, without husband or family; her income is meager and she has no transportation. She has a heart condition which, at least in her belief, prevents her from working and from keeping her house clean and relatively neat. Her child Rebecca is frail, under-developed physically and mentally, and probably lacks proper nourishment on a regular basis. The extent of emotional disturbance of the child can only be a subject of speculation, based upon her reported conduct.

The trial court made three findings of fact upon which it based its judgment that the parental relationship should be terminated. These are stated in the language of the statute. Section 15.02, Texas Family Code.

"4. Dorothy Woods knowingly placed or knowingly allowed Rebecca Elizabeth Woods to remain in conditions or surroundings which endangered the physical or emotional well-being of Rebecca Woods. [Section 15.02(1)(D)]

"5. Dorothy Woods engaged in conduct or knowingly placed Rebecca Elizabeth

Woods with persons who engaged in conduct which endangered the physical or emotional well-being of Rebecca Elizabeth Woods. [Section 15.02(1)(E)]

"6. Termination of the parent-child relationship of Dorothy Woods is in the best interest of Rebecca Elizabeth Woods." [Section 15.02(2)]

In involuntary termination proceedings under Section 15.02 of the Texas Family Code, the State is required to prove one or more of the acts or omissions under Subdivision (1) of that section, and in addition prove, under Subdivision (2), that the termination is in the best interest of the child. Under the State's allegation in the case at bar, it was required to prove not only that termination would be in the best interest of the child, but that the mother had committed some act or omission under Subdivision (1) which endangered the child's physical or emotional well-being.

 In this State a presumption exists that the child's interest will best be served by placing custodial responsibility with the natural parent. In involuntary termination proceedings under Section 15.02, the burden is upon the State to rebut this presumption, and the evidence must be clear and substantial. *In Re R____ D____ P____*, 526 S.W.2d 135 (Tex.Civ.App.—Dallas 1975, no writ); *Hall v. Harris County Child Welfare Unit*, 533 S.W.2d 121 (Tex.Civ.App.—Houston [14th] 1976, no writ).

 There is an important difference in the nature of the proof required in proceedings for conservatorship and support of children, and in proceedings for the involuntary termination of the parent-child relationship. This distinction is precisely explained by Justice Pope in *Wiley v. Spratlan*, 543 S.W.2d 349, Tex.1976:

"Suits for conservatorship, possession, and support are governed by Chapter 14 of the Family Code and those matters are determined by the 'best interest' test. Section 14.07. Those proceedings are different and have different purposes from termination cases. Decrees under Chapter 14 may be modified or changed from time to time, but the parent still retains some rights in and control over a child. A termination decree, on the other hand, is complete, final, irrevocable. It divests for all time the parent and child of all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit. See Section 15.07. The differences in the proceedings justifies the caution with which courts have characteristically considered termination cases.

"Actions which break the ties between a parent and child 'can never be justified without the most solid and substantial reasons.' *State v. Deaton*, 93 Tex. 243, 54 S.W. 901 (1900). Particularly in an action which permanently sunders those ties, should the proceedings be strictly scrutinized. This court has always recognized the strong presumption that the best interest of a minor is usually served by keeping custody in the natural parents. *Herrera v. Herrera*, 409 S.W.2d 395 (Tex. 1966); *Gunn v. Cavanaugh*, 391 S.W.2d 723 (Tex.1965); *Mumma v. Aguirre*, 364 S.W.2d 220 (Tex.1963). *Mumma* says:

The presumption is based upon a logical belief that the ties of the natural relationship of parent and child ordinarily furnish strong assurance of genuine efforts on the part of the custodians to provide the child with the best care and opportunities possible, and, as well, the best atmosphere for the mental, moral and emotional development of the child.

"The natural right which exists between parents and their children is one of constitutional dimensions. *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Armstrong v. Manzo*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). The presumptive right of parents is grounded on good policy considerations.

Although 'natural right' has developed firm roots in family law, the mere label obviously provides little concrete justification for protecting parents' interests. Modern theories of child welfare, however, offer persuasive support to parental rights, and suggest that the legal system should generally defer to the wishes of a child's parents, obliging the state to bear a serious burden of justification before intervention. State Intrusion into Family Affairs: Justification and Limitations, 26 Stanford L.Rev. 1383, 1385 (1974)."

A judgment terminating a parent-child relationship under Section 15.02 cannot be based solely upon the trial court's determination of what would be in the best interest of the child. *Holley v. Adams*, 544 S.W.2d 367 (Tex.1976). Where the State has alleged that termination is justified on the basis of Subdivision (1)(D) or (1)(E), it must prove by "solid and substantial" evidence either that the mother knowingly placed or allowed her child to remain in conditions or surroundings which endangered her child's physical or emotional well-being, or that she engaged in conduct or knowingly placed the child with persons whose conduct endangered her child's physical or emotional well-being. The evidence in the case at bar does not meet this test. Although it is painfully apparent that the mother failed to meet certain minimal standards of parental behavior considered by today's society as reasonably appropriate, this failure was just as clearly the result of her basic lack of understanding of her parental responsibilities and of her emotional and physical disabilities.

A parent's mental state may allow or compel him to engage in conduct which endangers the physical or emotional well-being of his child, and in such event, that conduct is evidence bearing upon the advisability of terminating the parent-child relationship. *Carter v. Dallas County Child Welfare Unit*, 532 S.W.2d 140, 142 (Tex.Civ. App.—Dallas 1975, no writ). However, the harsh and irrevocable remedy of termination is not justified where the evidence shows that a parent's failure to provide a desirable degree of care and support of the child is due solely to lack of intelligence, training, or misfortune. *D——— F——— v. State*, 525 S.W.2d 933, 940 (Tex.Civ.App. —Houston [1st] 1975, no writ).

The evidence shows that Mrs. Woods and her daughter Rebecca had a reasonably good emotional relationship, and it is uncontroverted that each had expressed mutual love and affection. Both Mrs. Woods and her child were making some progress in their relationship to each other and with respect to their day to day living patterns. Each expressed a desire that they be permitted to continue living together as mother and child. Only the testimony concerning the child's behavior upon her return to the nursery following the Christmas vacation indicates any departure from this line of progress, and the uncontroverted testimony of Dr. Androes tended to show that such behavior was not unusual and had only temporary significance.

The evidence does not support the trial court's findings that Mrs. Woods knowingly placed or allowed Rebecca to remain in an environment which endangered her physical or emotional well-being, or that she engaged in conduct or knowingly placed her with persons whose conduct endangered her physical or emotional well-being. On the contrary, the great weight and preponderance of the evidence shows that Mrs. Woods was making an effort to conform with the requirements of the Child Welfare Unit, and that with the assistance of the supporting agencies she and her daughter were making some progress, however slight, in the improvement of their emotional stability and in their living conditions.

The State failed to establish by medical proof that the child's developmental disabilities were attributable to her environmental surroundings or to her relationship with her mother. The only medical evidence in the record leaves these matters for speculation. Apropos is the statement of Justice Cire in *Hall v. Harris County Child Welfare Unit*, supra:

"We do not intend to imply that this is not a proper case for termination; however it is clear from the record that the evidence of the physical and emotional ill-health of the children and their mother was not sufficiently developed to satisfy the requirements of clear and convincing proof. Whenever a cause relies heavily, as does this one, on the proof of medical facts, then the party on whom rests the burden of proof must come forward with medical testimony or medical records, or some evidence other than hearsay or the unsubstantiated opinion of witnesses not qualified as medical experts." 533 S.W.2d 123.

■ Since the cause will be remanded for further proceedings, it is appropriate to consider Mrs. Woods' sixth point of error contending that the statutory burden of proof in termination suits is unconstitutional. The statute provides that the court's findings in such cases shall be based upon a preponderance of the evidence under rules generally applicable to civil cases. Section 11.15, Texas Family Code. Mrs. Woods asserts that the State should be required to prove the elements of Section 15.02 "beyond a reasonable doubt." The standard of proof required by the statute is constitutional. A requirement that the proof be beyond a reasonable doubt would likely result in detriment to the party who most needs protection, the child. This point is overruled.

In her seventh point of error Mrs. Woods contends that the trial court erred in failing to appoint a counsel for her prior to the show cause hearing and that this omission deprived her of due process as guaranteed by the Constitution. This point was withdrawn by counsel for Mrs. Woods upon oral argument and need not be further considered.

■ Since the best interest of the child will be affected by this court's ruling that the judgment must be reversed, the cause will be remanded for further development of the evidence. *Hall v. Harris County Child Welfare Unit*, supra.

Reversed and remanded.