NO. 07-08-0487-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

OCTOBER 29, 2009
_____

IN THE INTEREST OF B.W.B. A/K/A B.S., A CHILD
_____

FROM THE 242ND DISTRICT COURT OF HALE COUNTY;

NO. B35481-0706; HONORABLE ED SELF, JUDGE
_____

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

**MEMORANDUM OPINION**

This is an appeal from an order terminating the parental rights of both appellants[1] to their child B.W.B., after a jury trial in a proceeding brought by appellee, the Texas Department of Family and Protective Services. We affirm the trial court's judgment.

Background

B.W.B's mother has four other children, all of whom were previously removed by the Department based on allegations of neglect. She later regained possession of three of the

_____

[1] To protect the child's privacy, we refer to appellants jointly as "the parents" and individually as "the mother" and "the father" and the child by his initials. *See* Tex. Fam. Code Ann. § 109.002(d) (Vernon 2009).

children. In 2002, one of them, two-year-old M.S., was seriously injured while with her mother. M.S. sustained a fractured skull, severe bruising of her legs, and bruises with visible fingerprints on her buttocks. The mother and the father apparently were living together at the time of the injuries to M.S. The mother initially said the father injured M.S. but later recanted that accusation and maintained M.S. was injured from a fall in the bathtub.[2] As the result of the injuries to M.S., in January 2003 the mother plead guilty to knowing or intentional serious injury to a child, a first degree felony. Pursuant to a plea agreement, she received deferred adjudication community supervision for a period of seven years.[3] As part of the plea agreement, the mother relinquished her parental rights to her children A.S., M.S., V.S.[4] and S.S.[5] One of the conditions of her community supervision was that she have "no association of any kind" with the father. Nonetheless, B.W.B. was born to them in December 2006.

---

[2] At the adversary hearing regarding B.W.B., a Department caseworker testified regarding the injuries to M.S. that the mother initially stated the father came home "very angry, very upset." According to the caseworker, the mother further said that after the father arrived home, he became angry when one of the girls made a mess on the floor. M.S. then woke up crying. The mother picked M.S. up and the father started hitting the mother. Later that evening, M.S. spilled juice on the floor. The mother said the father became angry and spanked the child and threw her into a chair. The father was never charged in connection with M.S.'s injuries.

[3] *See* Tex. Penal Code Ann. § 22.04 (Vernon 2003). The mother's probation later was extended for an additional three years.

[4] In May 2005, the father's rights to V.S. were terminated. A paternity test was never done to determine whether the father was V.S.'s biological father. At the adversary hearing concerning B.W.B., the mother answered "no" when asked if B.W.B.'s father was the father of her other children. At trial, the mother clarified, stating she was seeing two men at the time V.S. was conceived, one of whom was B.W.B.'s father.

[5] The mother testified two of her children were adopted by unrelated parties and two went to live with their respective fathers.

The mother testified she was living with B.W.B.'s maternal grandfather when B.W.B. was born, and that after the child's release from the hospital, B.W.B. lived there with her for about one-and-a-half months. The mother and the father then agreed the child would live with the father, who apparently lived alone. B.W.B. had his own room at his father's house. However, the parents were "sharing the responsibilities of caring for [B.W.B.]." The mother visited the child at the father's home. According to the parents, these visits were supervised by a babysitter or the child's maternal grandfather.

In June 2007, the Department received a report about B.W.B.[6] A Department investigator, accompanied by law enforcement officers, visited the home of B.W.B.'s father to investigate the report. The mother answered the door. Both parents denied the couple had a baby together. Later that day, the parents admitted B.W.B. was their child, and agreed to take him to the Department for examination. When the parents took B.W.B. to the Department that afternoon, Department personnel decided to remove B.W.B. based on the risk of physical abuse because of the parents' history with M.S. B.W.B. was placed in foster care.[7]

---

[6] A Department caseworker testified at the adversary hearing that there was "an intake received stating that [the mother] had just given birth to a child, or a newborn was in the home of [the mother], when we got a report. And that all her other kids had been taken from her. She was not to be around any children, was the report."

[7] B.W.B's foster mother intervened at trial. She has filed appellate briefs in response to each of the parents' briefs, indicating her position that the termination should be upheld. She has indicated a willingness to adopt B.W.B. She previously adopted one of B.W.B.'s siblings and maintained regular contact with the adoptive family of another of B.W.B.'s siblings.

3

Thereafter, the Department filed its petition seeking, among other relief, termination of the parents' parental rights to B.W.B. An adversary hearing was held on June 22, 2007, during which the trial court continued the Department as the temporary managing conservator. In November 2008, trial commenced on the Department's petition.

Pursuant to the jury's findings, the trial court found each of the grounds alleged by the Department supported termination, as to both parents, and termination of both parents' rights was in the best interests of the child. After the court entered its order of termination, both parties filed motions for new trial which the trial court overruled. This appeal followed.

Analysis

*Grounds for Termination*

Pursuant to section 161.001 of the Family Code,[8] the Department's amended petition alleged two grounds for the termination of the mother's parental rights to B.W.B.: (1) mother had been convicted or placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child under section 22.04 of the Penal Code;[9] and (2) mother failed to comply with the provisions of a court order that specifically established the actions

---

[8] Tex. Fam. Code Ann. § 161.001 (Vernon 2009).

[9] *See* Tex. Penal Code Ann. § 22.04 (Vernon 2003); Tex. Fam. Code. Ann. § 161.001(1)(L) (Vernon 2009).

necessary for the mother to obtain the return of the child who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.[10]

Grounds alleged for the termination of the father's parental rights to B.W.B. included: (1) father knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child;[11] (2) father engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;[12] and (3) father failed to comply with the provisions of a court order that specifically established the actions necessary for the father to obtain the return of the child who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.[13]

On appeal, the mother of the child brings seven issues and the father three issues, contesting the involuntary termination of their parental rights.  Underlying most of the appellate issues presented by the parents is a challenge to the pertinence of the 2002

---

[10] *See* Tex. Fam. Code Ann. § 161.001(1)(O) (Vernon 2009).

[11] *See* Tex. Fam. Code Ann. § 161.001(1)(D) (Vernon 2009).

[12] *See* Tex. Fam. Code Ann. § 161.001(1)(E) (Vernon 2009).

[13] *See* Tex. Fam. Code Ann. § 161.001(1)(O) (Vernon 2009).

injuries to M.S., and the mother's later guilty plea to injury to a child, to resolution of the issues before the trial court in regard to B.W.B, born in 2006. We will address each of the parents' appellate contentions, but note at the outset we must reject their arguments seeking to minimize the relevance of the injuries M.S. suffered under their care to issues regarding their ability to parent B.W.B.

## A.

### Temporary Orders

The parents first challenge the trial court's temporary orders, issued after the June 2007 adversary hearing. In the mother's first issue, she argues the Department failed to meet the standard of an emergency removal under Family Code section 262.104[14] and the trial court then erred in appointing the Department as the child's temporary managing conservator. The father brings a similar issue.[15]

The parents also argue the trial court erred when it denied their motions to vacate the temporary orders, filed just before trial in November 2008. As with other issues, the

---

[14] Unless otherwise indicated, references to Sections are to the cited section of the Texas Family Code Annotated (Vernon ___).

[15] The Department and the intervenor argue it is too late to bring an appeal from the temporary orders. The mother contends the temporary orders caused her harm even at the time of trial on the petition seeking termination. *See* Tex. R. App. P. 44.1(a) (standard for reversible error). Although we will address the issues challenging the temporary orders, we do not reach the mother's contention regarding harm because we conclude the trial court did not err through its temporary orders.

parents' argument here is premised on the assertion the Department should not have removed B.W.B. based solely on the parents' history concerning M.S.

As pertinent here, § 262.104 of the Family Code provides that if there is no time to obtain a temporary restraining order or attachment before taking possession of a child, consistent with the child's health and safety, the Department may take possession of a child without a court order, but only on facts that would lead a person of ordinary prudence and caution to believe there is an immediate danger to the physical health or safety of the child. Tex. Fam. Code Ann. § 262.104 (Vernon 2009). After such an emergency removal, a court must hold an initial hearing, then a full adversary hearing within fourteen days of the child's removal. Tex. Fam. Code Ann. §§ 262.106, 262.201(a) (Vernon 2009).

Section 262.201(b) provides:

> At the conclusion of the full adversary hearing, the court shall order the return of the child to the parent, managing conservator, possessory conservator, guardian, caretaker, or custodian entitled to possession unless the court finds sufficient evidence to satisfy a person of ordinary prudence and caution that:
>
> (1) there was a danger to the physical health or safety of the child which was caused by an act or failure to act of the person entitled to possession and for the child to remain in the home is contrary to the welfare of the child;
>
> (2) the urgent need for protection required the immediate removal of the child and reasonable efforts, consistent with the circumstances and providing for the safety of the child, were made to eliminate or prevent the child's removal; and
>
> (3) reasonable efforts have been made to enable the child to return home, but there is a substantial risk of a continuing danger if the child is returned home.

7

Here, after the adversary hearing the trial court made the findings required by paragraphs (1), (2) and (3) of § 262.201(b). The parents argue the evidence before the court at the adversary hearing was insufficient to sustain the findings.

As the Austin court of appeals noted in *In re Steed,* No. 03-08-00235-CV, 2008 WL 2132014 (Tex.App.–Austin May 22, 2008, orig. proceeding), removing a child from his home and parents on an emergency basis before fully litigating the issue of whether the parents should continue to have custody of the child is an extreme measure that the legislature has said may be taken only when the circumstances indicate a danger to the physical health and welfare of the child and the need for his protection is so urgent that immediate removal from the home is necessary. *Id.;* Tex. Fam. Code Ann. § 262.201(b) (Vernon 2009). Unless evidence demonstrates the existence of each of the requirements of section 262.201(b), the court is required to return the child to the custody of his parents pending litigation. *Steed,* 2008 WL 2132014, at *1. We review the trial court's action under an abuse of discretion standard. *Id.* at *4.

We agree with the parents the record shows the removal of B.W.B. from the father's home and the appointment of the Department as temporary managing conservator were based largely on the perceived risks to the child from the 2002 injuries to M.S.[16] We acknowledge also the evidence showed B.W.B., then six months old, was healthy, current

---

[16] At the end of the adversary hearing, the court stated "[t]he decision today is out of an abundance of caution to make sure that this child is protected."

on doctor visits and vaccinations, free of injuries and bruises, and residing in appropriate surroundings. But the trial court's consideration of the circumstances surrounding the injuries to M.S. was expressly authorized by statute. In determining whether the evidence showed a continuing danger to the physical health or safety of B.W.B., the Family Code authorized the trial court to consider whether the child's household included a person who had abused or neglected another child in a manner that caused serious injury to the other child. *See* Tex. Fam. Code Ann. § 262.107(b) (Vernon 2008) (initial hearing); Tex. Fam. Code Ann. § 262.201(d) (Vernon 2008) (adversary hearing).[17] Although the mother testified she was living with her father, the evidence will not permit her to deny that she was among those in the "child's household." The evidence shows she was routinely present in the home in which B.W.B. was living with his father. At the adversary hearing, the father agreed with his counsel that the parents were "sharing the responsibilities of caring for [B.W.B.]." And when the caseworker went to the father's home to investigate the initial report regarding B.W.B., the father was at work and the mother answered the door. At the adversary hearing, the trial court heard the mother testify that M.S. fell in the bathtub to cause her serious injuries, but the court also heard evidence of the mother's guilty plea and deferred adjudication for those injuries, and heard testimony that as late as May 2005 the mother still was asserting her belief the father caused the injuries. Given that state of the evidence, and the express statutory authorization for its consideration of the mother's

---

[17] *See also* Tex. Fam. Code Ann. § 101.009 (Vernon 2008) (defining "danger to the physical health or safety of a child" as including "exposure of the child to loss or injury that jeopardizes the physical health or safety of the child without regard to whether there has been an actual prior injury to the child)."

responsibility for M.S.'s serious injuries under § 262.201(d), we see no abuse of discretion in the trial court's finding of a continuing danger to B.W.B.'s physical safety.

The parents cite *In re Cochran,* 151 S.W.3d 275, 279-81 (Tex.App.–Texarkana 2004, orig. proceeding), in which the court held that evidence heard at an adversary hearing was insufficient for the trial court to deny parents' possession of a newborn, despite prior terminations of its mother's nine other children and its father's three other children, because those parents' most recent endangering conduct occurred fourteen months before the newborn's birth and there was no evidence the current conditions were a danger to the newborn's health or safety. We find *In re Cochran* distinguishable because there is no indication the parents' prior history in that case included a plea of guilty to a felony offense of injury to a child or other comparable conduct, which, by statute, may be considered in future determinations of parental suitability. *In re Cochran,* 151 S.W.3d at 281; *see* Tex. Fam. Code Ann. § 161.001(1)(L) (Vernon 2009).[18]

The same evidence supports the trial court's finding there was a substantial risk of a continuing danger if B.W.B. was returned home. Tex. Fam. Code Ann. § 262.201(b)(3) (Vernon 2008). The parents further argue the trial court heard no evidence at the adversary hearing from which it could have concluded the urgent need for protection required the immediate removal of the child and reasonable efforts, consistent with the

---

[18]The mother's deferred adjudication on the charge of serious injury to M.S. similarly distinguishes this case from *In re Steed,* the case arising from the 2008 removal of 468 children from the ranch community near Eldorado, Texas. *In re Steed,* No. 03-08-00235-CV, 2008 WL 2132014. *See also In re M.L.J.,* No. 02-07-00178-CV, 2008 WL 1932076, (Tex.App.–Fort Worth May 1, 2008 pet. denied) (mem. op.) (removal upheld when there was a risk or fear of abuse as opposed to actual abuse or neglect).

circumstances and providing for the safety of the child, were made to eliminate or prevent the child's removal. Tex. Fam. Code Ann. § 262.201(b)(2) (Vernon 2008). We disagree, and find the trial court's finding in that regard supported by evidence of the parents' disregard of the court-ordered terms of the mother's community supervision and both parents' initial efforts to hide their parentage of B.W.B. from the Department's investigation.

Finding the trial court did not abuse its discretion by its temporary orders continuing the Department's possession of B.W.B. after the adversary hearing, we overrule mother's first and second issues and father's issues one-a, one-b and one-d.

B.

Sufficiency of the Evidence Supporting Termination

Standard of Review

In proceedings to terminate the parent-child relationship, the petitioner must establish one or more acts or omissions enumerated by statute and must additionally prove that termination of the parent-child relationship is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001 (Vernon 2009); *In re J.O.A.,* 262 S.W.3d 7, 22 (Tex.App.–Amarillo 2008), *aff'd as modified and remanded,* 2009 WL 1165303 (Tex. May 1, 2009). Both elements must be established and proof of one element does not relieve the petitioner of the burden of proving the other. *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex. 1976); *In re J.O.A.,* 262 S.W.3d at 22. Because termination of parental rights is of such weight and gravity, due process requires the petitioner to justify termination by clear

11

and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001; *In Interest of G.M.,* 596 S.W.2d 846, 847 (Tex. 1980). Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *In re C.H.,* 89 S.W.3d 17, 52-26 (Tex. 2002); *In re J.F.C.,* 96 S.W.3d 256, 264 (Tex. 2002).

When reviewing factual findings required to be made by clear and convincing evidence, we apply a standard of review that reflects this burden of proof. *In re S.M.L.,* 171 S.W.3d 472, 476 (Tex.App.–Houston [14th Dist.] 2005, no pet.). When reviewing the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that the finding was true. *Id., citing In re J.F.C.,* 96 S.W.3d at 266. In doing so, we assume the fact finder resolved disputed facts in favor of the finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible. *Id.* However, because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *In re J.F.C.,* 96 S.W.3d at 266 ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence").

Under a factual sufficiency review, we also must determine whether a fact finder could reasonably form a firm belief or conviction about the truth of the allegations. *In re S.M.L.,* 171 S.W.3d at 476. When reviewing a factual sufficiency challenge, the analysis

is somewhat different in that we must consider all of the evidence equally, both disputed and undisputed. *In re J.F.C.,* 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not have reasonably formed a firm belief or conviction, then the evidence is factually insufficient. *In re S.M.L.,* 171 S.W.3d at 476 (*citing In re J.F.C.,* 96 S.W.3d at 266).

(1)    *Sufficiency of Evidence to Support Termination under Section 161.001(1)(0)*

As noted, the grounds alleged in the Department's amended petition for termination of the mother's parental rights to B.W.B. were those set forth in §§ 161.001(1)(L) and 161.001(1)(O).  The mother argues the trial court erred by submitting to the jury the ground for termination under § 161.001(1)(O).  Only one ground is required for termination.  *In re J.O.A.,* 262 S.W.3d at 23; *In re S.F.,* 32 S.W.3d 318, 320 (Tex.App.–San Antonio 2000, no pet.). The mother concedes the evidence supported termination of her parental rights to B.W.B. under § 161.001(1)(L).   We therefore do not address her challenge to the evidence supporting termination under section 161.001(1)(0).  The mother's issues three and four are overruled.

(2)    *Sufficiency of Evidence to Support Termination of Parental Rights*

Conceding the evidence supported termination of her parental rights to B.W.B. under section 161.001(1)(L) of the Family Code, the mother argues the evidence was

13

legally and factually insufficient to support the jury's finding that termination was in the child's best interest. We disagree.

We begin by noting that in termination cases, like elsewhere, it is within the sole province of the jury to weigh the credibility of witnesses. *See In re S.L.*, 188 S.W.3d 388, 394 (Tex.App.–Dallas 2006, no pet.), *citing Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex. 2003) (stating the fact finder "is the sole judge of the credibility of witnesses and the weight to be given to their testimony"). In particular, with respect to the circumstances surrounding the injuries to M.S., the jury was free to believe or disbelieve the mother's version of events concerning those injuries.

During her trial testimony, the mother acknowledged she had told more than one story about what happened to M.S. She blamed the father for the injuries at first and stated she recanted because the father "was at work at that time." She said she accused him only because she was scared, and she maintained M.S. was injured from a fall in the bathtub. She testified she plead guilty to causing the child's injuries because she had been in jail for seven months and was offered probation.

On appeal, the mother points out that none of the witnesses provided by the Department refuted her statements at trial concerning the manner in which the injury to M.S. occurred, and argues there is no evidence they occurred otherwise. We do not agree the jury was bound to accept the mother's trial testimony. If, as it was free to do, the jury believed instead that the mother plead guilty to the criminal charge of injury to a child because she was guilty, the jury likely also would conclude the mother was entirely

14

unwilling to address her actions and their consequences. In that regard, the jury also heard the father's testimony suggesting he did not believe the injuries to M.S. happened as the mother said, and he took steps to protect B.W.B. by hiring a babysitter to supervise visits between the mother and B.W.B. The father further testified he checked B.W.B. for injuries after visits from the mother and had the babysitter do the same. A psychologist who testified also expressed concern over the mother's changing stories about the injuries to M.S.

In making her argument, the mother relies on the nine nonexclusive factors set forth in *Holley,* 544 S.W.2d 367.[19] Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of a child. *In re C.H.,* 89 S.W.3d 17, 27 (Tex. 2002). On the other hand, the presence of scant evidence relevant to each *Holley* factor will not support such a finding. *Id.* The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree v. Texas Dep't Prot. & Reg. Servs.*, 907 S.W.2d 81, 86 (Tex.App.–Dallas 1995, no writ). But there is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. *Swate v. Swate,* 72 S.W.3d 763, 767 (Tex.App.–Waco 2002, pet.

---

[19] These factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist these persons; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions committed by the parent. *Holley,* 544 S.W.2d at 371-72.

denied). On the other hand, the goal of establishing a stable permanent home for a child is a compelling state interest. *Dupree*, 907 S.W.2d at 87.

The mother points to evidence weighing against a finding termination of her parental rights was in the best interest of B.W.B. She contends the evidence showed B.W.B. was happy, held on to her and called her "Mommy"; the mother demonstrated an understanding of B.W.B.'s current and future emotional and physical needs; the Department considered her supervised visits with B.W.B. to be appropriate and none were terminated early; no evidence showed she did not have the requisite parental abilities to care for B.W.B; she testified she would seek help if needed with B.W.B.; B.W.B.'s living arrangements at the father's house were suitable and the father was gainfully employed; and at the time of trial, the mother had her own residence and was employed.

The mother acknowledged at trial that she lied to Department investigators about having B.W.B., explaining she knew that based on her past, the Department would "try to take him." The mother acknowledged she had three other children removed for neglect but noted they were returned to her. She argues she took responsibility for the accidental injuries to M.S. by pleading guilty and receiving deferred adjudication community supervision. She also notes none of her other children were ever injured while in her care. In that respect, she acknowledged only that she did not supervise her children closely enough.

The jury also heard the opinion testimony of the psychologist, who expressed concerns about the mother's suitability as a parent. He observed that she "did not really

experience her son as a source of positive reinforcement, and there may be some difficulty in the attachment with her son." He noted she had a significant history with CPS and had made poor decisions regarding relationships, including several relationships with different men in a short period of time, and opined that she would likely continue to do so. He expressed concern about the mother's functional independence and her stability, noting she did not have a driver's license. The psychologist concluded, with respect to the mother, "[g]iven what appears to be a chronic history of psychological difficulties, however, the probability of any meaningful change may be genuinely limited at best." A caseworker and counselor testified similarly.

Considering all the evidence in relation to the best interest factors in the light most favorable to the jury's findings, we conclude a reasonable trier of fact could have formed a firm belief or conviction that termination was in the child's best interest. And viewing all the evidence in a neutral light, we conclude that the disputed and undisputed evidence favoring and disfavoring the verdict permits a reasonable factfinder to form a firm conviction and belief that termination was in B.W.B.'s best interest. The evidence supporting the jury's finding that termination of the mother's parental rights was in B.W.B.'s best interest is legally and factually sufficient. *See Holley,* 544 S.W.2d 367; *In re S.M.L.D.,* 150 S.W.3d 754, 756 (Tex.App.–Amarillo 2004, no pet.). We overrule the mother's fifth issue.

17

(4)     *Father's Claims–No Grounds for Termination and Not in B.W.B.'s Best*

          *Interests*

In his second issue, the father argues the evidence was legally and factually insufficient to support termination of his rights to B.W.B.  He challenges both the evidence supporting the grounds the Department plead and that supporting the finding termination was in his son's best interests.

The statutory grounds alleged by the Department against the father included those set forth in §§ 161.001(1)(D) and 161.001(1)(E), both of which require proof of the child's endangerment.  Endangerment means to expose to loss or injury, to jeopardize.  *Boyd,* 727 S.W.2d at 533; *In re J.T.G.,* 121 S.W.3d 117, 125 (Tex.App.–Fort Worth 2003, no pet).  *See also In re M.C.,* 917 S.W.2d 268, 269 (Tex. 1996) and *In the Interest of M.M.F., J.J.F., and E.F.,* No. 02-08-014-CV, 2008 WL 5401411 (Tex.App.–Fort Worth Dec. 18, 2008, no pet.) (mem. op.).  Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the father's conduct, including acts, omissions, or failures to act.  *See* Tex. Fam. Code Ann. § 161.001(1)(E) (Vernon 2009); *J.T.G.,* 121 S.W.3d at 125.  The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(1)(E) (Vernon 2009); *In re C.L.C.,* 119 S.W.3d 382, 396 (Tex.App.–Tyler 2003, no pet.).  Additionally, termination under subsection (E) must be based on more than a single

18

act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125; see Tex. Fam. Code Ann. § 161.001(1)(E). However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd,* 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex.App.–Fort Worth 2004, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex.App.– Fort Worth 2001, no pet.).

Stability and permanence are paramount in the upbringing of children. *See In re T.D.C.,* 91 S.W.3d 865, 873 (Tex.App.–Fort Worth 2002, pet. denied). A fact finder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex.App.– Waco 1997, pet. denied), *disapproved on other grounds by J.F.C.,* 96 S.W.3d at 256, and *C.H.,* 89 S.W.3d at 17.

We find the jury could have formed a firm belief that B.W.B. was endangered by being left alone with his mother. By his own testimony, the father clearly considered the mother was a danger to the child. He testified about his actions to safeguard the child from the mother. He said he hired a babysitter to watch B.W.B. while he was at work because he knew "something happened at my house [with regard to M.S.], and [he] didn't want to leave [B.W.B.] unattended with [the mother]. And so [he] had the baby-sitter check for

injuries, and [he] also checked for injuries." The counselor who saw the mother testified, "I don't think [the mother] would be a safe parent to have unsupervised visits . . . [a]nd I think she's unsafe to be with the child."

We further agree with the Department that, despite the parents' testimony otherwise, the jury could have formed a firm belief that B.W.B. was being left alone with the mother. The father testified that allowing the child to live with the mother was "never an option." But testimony also showed that when the caseworker first went to the father's home to check on B.W.B., the mother answered the door, and her own testimony concerning that occasion indicates she was the only adult in the house.[20] The father's testimony concerning his employment of a babysitter indicated he hired the young woman in November 2006, a month before B.W.B. was born. By the time the adversary hearing was held in June 2007, the father no longer employed the babysitter.[21] A caseworker expressed her opinion that the father was leaving B.W.B. alone with the mother.

The jury also could have concluded the evidence reflected a conscious course of conduct by the father of placing the child alone with the mother. The counselor who conducted therapy sessions with both parents testified he did not believe the father would be an adequate supervisor of the mother with B.W.B. because he had "an attitude that

[20] The mother testified her father was on the property at the time, in a trailer located there. She also indicated B.W.B. was with the babysitter at another location. However, the father testified at the adversary hearing that he had to let the babysitter go due to unreliability. It is unclear whether B.W.B. was alone with the mother in the house or at another location with the babysitter.

[21] The father testified at the adversary hearing that he had to let the babysitter go because he could not depend on her to watch B.W.B. when needed.

20

she's not that dangerous." The father acknowledged he was aware he was not supposed to have contact with the mother, under the conditions of her community supervision, but felt that as the mother of B.W.B., supervised visits "would be fine." One of the psychologists testified that the father "seemed to not be willing to completely put [B.W.B.'s] needs first and to take the action that he need to take, mainly, staying [away] from [the mother] and having no contact with her and let her have no contact with the child."

As evidence contrary to the finding in favor of termination, the father points to the testimony of the Department caseworkers. One of the caseworkers testified at trial that she visited the father's home and found it "very appropriate." Another testified the father's home was "safe" and "an appropriate home." The father also points out there was no evidence he ever injured or abused B.W.B., the mother, or any other child.

Looking at all the evidence in the light most favorable to the jury's finding, however, we conclude a reasonable trier of fact could have formed a firm belief that the father engaged in a course of conduct that endangered B.W.B.'s physical or emotional well-being, thus supporting termination under subsection E. *See In re C.H.,* 89 S.W.3d at 25; *In re J.F.C.,* 96 S.W.3d at 266. We conclude the evidence is legally sufficient to support termination of his parental rights. Likewise, viewing the evidence in a neutral light, and considering both the evidence favoring and disfavoring the jury's finding, we conclude that there was sufficient evidence to support the jury's endangerment conclusion.

(5) *Challenge to Findings of Best Interests of B.W.B.*

The father also challenges the jury's finding that termination of his parental rights was in the best interests of B.W.B. He points to the strong presumption that the best interest of the child is served by keeping custody in the natural parent. *Allred,* 615 S.W.2d at 806. It is the Department's burden to rebut this presumption. *In re R.E.W.,* 545 S.W.2d 573, 581 (Tex.Civ.App.–Houston [1ˢᵗ Dist.] 1976, writ ref'd n.r.e.).

The father highlights evidence to support the *Holley* factors. *See Holley,* 544 S.W.2d at 371. He notes B.W.B. loves him and runs to him and calls him "Daddy;" his home is very appropriate for a child, he provides what B.W.B. needs and several Department workers observed him interact with B.W.B. in a caring and loving manner; B.W.B is happy, healthy, well-nurtured, and loved and did not have injuries of any kind; and B.W.B. had seen doctors regularly and had been immunized properly. The father further points to the undisputed evidence that B.W.B. lived with him for six months with no occurrence of a harmful incident; the father provided an appropriate room for B.W.B. in a suitable home; the father was gainfully employed and provided child care for B.W.B. while he was at work; the father played with his son and indicated an understanding of what would be required for his son in the future. The father argues the only act or omission of which he is accused is that of permitting B.W.B. and the mother to visit. He again notes he arranged for these visits to be supervised by another adult and expressed his willingness to cease the visits if required by the court.

We do not discount the undisputed evidence that the father provided B.W.B. an appropriate home and that the child was not harmed while in the father's care.

Nevertheless, on this record the jury could have reached a firm conviction the father would not comply with an order of the court to cease allowing B.W.B. to be alone with the mother. B.W.B. was conceived through knowing violations of the mother's court-ordered terms of probation. The testimony further shows the father disregarded all advice that he cease contact with the mother. The most recently-assigned caseworker testified he recommended termination of the father's rights because if B.W.B. "were to be allowed to go back to [the father] or [the mother], I think he would be in immediate danger at this point." As noted, the counselor who met with both parents opined the father would not be an adequate supervisor of the mother with B.W.B. The same counselor went on to say he wished he could recommend returning B.W.B. to the father "because [the father] really cares about the child. But his thinking is just so irrational that it's difficult for him to stay stable and make good, valid decisions on protecting [B.W.B], you know, from [the mother] . . . he is not stable enough to be the custodian parent." The evidence that the endangering conduct would continue beyond termination of the mother's parental rights if the court had not terminated the father's rights as well strongly supports the jury's finding regarding the best interest of the child.

Looking at all the evidence in the light most favorable to the trial court's finding, a reasonable trier of fact could have formed a firm belief that termination of appellant's parental rights was in B.W.B.'s best interest. Likewise, viewing the evidence in a neutral light, we also conclude that there was sufficient evidence to support the jury's conclusion that termination of the father's parental rights was in B.W.B.'s best interest, and the contrary evidence is not so strong as to cast doubt on the jury's conclusions. We conclude the

evidence is legally and factually sufficient to support termination of appellant's parental rights.

We overrule the father's issue two-a through two-e.

C.

Father's Motion for New Trial

The father next argues the trial court erred in overruling his Motion for New Trial. Trial courts have broad discretion in ruling on motions for new trial. We review the denial of a motion for new trial for an abuse of discretion. *Limestone Const., Inc. v. Summit Commerical Indust. Properties, Inc.,* 143 S.W.3d 538, 542 (Tex.App.–Austin 2004, no pet.). A trial court abuses its discretion when it fails to correctly analyze or apply the law. *In re E.I. DuPont de Nemours & Co.,* 136 S.W.3d 218, 223 (Tex. 2004). In matters committed to a trial court's discretion, the test is whether the trial court acted arbitrarily or without reference to guiding legal principles. *Cire v. Cummings,* 134 S.W.3d 835, 838 (Tex. 2004).

We have found the evidence presented at trial sufficient to support the trial court's order terminating the father's parental rights to B.W.B. No new evidence was set forth in the motions for new trial. We find no abuse of discretion in its denial by the trial court and overrule father's issues one-c and two-f.

24

## D.

## Admission of Photographs

The parents argue the trial court erred by admitting four photographs of M.S., depicting her injuries. The first shows M.S.'s head and the incision made to treat swelling of her brain. The second shows blood or bruising in the child's ear. The third shows bruises on her buttocks and the fourth shows M.S. in a neck brace. At trial, the photographs were admitted through a Department employee using the business records exception.

The parents contend the photographs' admission was error because a proper predicate was not laid. The Department responds that issue was not preserved for review, and we must agree. To preserve a complaint for appellate review, a party must make a timely, specific objection in the trial court. Tex. R. App. P. 33.1; *In re S.E.W.,* 168 S.W.3d 875, 885 (Tex.App.–Dallas 2005, no pet.). Here, the parents' objections to admission of the photographs stated "lack of foundation" and "lack of predicate." Such objections are not sufficiently specific to preserve error. Tex. R. Evid. 103(a)(1); *Town of Flower Mound v. Teague,* 111 S.W.3d 742, 765-66 (Tex.App.–Fort Worth 2003, pet. denied). We overrule the mother's sixth issue and the father's third issue.

## E.

## Trial Court Erred in Appointing the Department Permanent Conservator of B.W.B.

The mother raises in her last issue that the trial court erred in appointing the Department as the permanent managing conservator for B.W.B. In this last issue, the

mother reiterates the points she made in her previous issues.  Finding our discussion of those issues adequately addresses the mother's seventh issue, we overrule her complaint.

Overruling each of the parents' issues, we affirm the trial court's order terminating the parents' rights to B.W.B.


James T. Campbell
Justice