02-11-153-CV-REH









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00153-CV

 

 


 
 
 In Interest of S.R., A Child
 
 
  
 
 
  
 
 
 
 
  
  
  
 
 
 
 
  
 
 
  
 
 
  
 
 


 

 

----------

FROM THE 355th
District Court OF Hood COUNTY

----------

MEMORANDUM
OPINION ON REHEARING[1]

----------

          After
considering Appellant A.R.’s motion for rehearing, we deny the motion but
withdraw our prior opinion and judgment of July 26, 2012, and substitute the
following.

I. 
Introduction

          Appellant
A.R. (Mother) appeals the judgment terminating her parental rights to her daughter
S.R.  She argues in three issues that the evidence is legally and factually
insufficient to support the jury’s verdict and that the trial court abused its
discretion by appointing the Department of Protective and Regulatory Services
(the Department) as S.R.’s managing conservator.  We affirm.

II. 
Background

          Mother
was nineteen years old at the time of trial in March 2011, and she has three
children.  Mother’s middle child, S.R., was born November 15, 2009.[2]
 S.R. was born prematurely, developed respiratory syncytial virus (RSV), and
was in and out of the hospital for several months following her birth.  She was
again admitted to the hospital in March 2010 and underwent a tracheotomy to
help her breathe.

          The
Department received a report on April 2, 2010, that S.R. was ready for
discharge from Cook Children’s Hospital but did not have properly trained
caregivers to whom she could be released.  Department investigator Shelby
Cozart conducted the investigation and learned that S.R. needed two “trach-trained”
caregivers before she could be released.  Cozart’s understanding was that S.R.
would not survive without a trach[3] because she “had a floppy
airway,” and the trach “kept her airway open so she could breathe.”  S.R.’s caregivers
had to know how to properly and timely change and suction the trach because
S.R. could die without appropriate care.

          Cozart
testified that hospital personnel were not willing to release S.R. to go home
without trach-trained caregivers available to care for her.  Cozart also testified
that hospital personnel had previously asked Mother “to stay at the hospital 24/7
in order to be trach train[ed], and . . . to complete some CPR trainings before
they would allow the child to go home with her.”  Cozart testified that
Mother’s mother, J.R., had also said that she would undergo the trach training.
 Cozart testified that Mother and J.R. would often leave and go home rather
than stay at the hospital with S.R.

          Cozart
also testified about a calendar that had been prepared to show the dates of
S.R.’s hospital stay and the dates that Mother stayed at the hospital with S.R.[4]
 S.R. was admitted on March 3, and Mother remained at the hospital every day
between March 3 and March 12.  Mother left the hospital on March 13 and did not
return until March 18.  Mother was not at the hospital between March 19 and 21.
 Mother was at the hospital on March 22 but did not return again until March
26.  S.R. underwent her first tracheotomy procedure on March 27, and she was
transferred to the transitional care unit that same day.  Mother was not,
however, at the hospital between March 28 and 31.  A nurse contacted the
Department on April 2, 2010, because Mother did not appear for a scheduled
training session.  When Cozart met with the nurse on April 5, she learned that
Mother had not been to the hospital at any time the previous three days.

          Cozart
first met with Mother on April 5 or 6 and discussed the need for Mother to stay
at the hospital for training.  Mother said that she understood what the
hospital was asking her to do and that she would stay at the hospital.  Mother
remained at the hospital through April 10, but she left the morning of April 11
and did not return until the afternoon of April 13.  Mother remained at the
hospital from April 14 through 16 but left again on April 17.  Mother returned
to the hospital on April 19 but did not stay.

          On
April 20, the Department removed S.R. and placed her with a trach-trained
foster family.  The Department’s decision to seek removal was based, in part,
on a “care conference” at the hospital on April 16.  At the meeting, Cozart,
the Department liason from the hospital, and S.R.’s doctors and nurses
discussed with Mother and J.R. the necessity of completing the trach training
and the high likelihood that S.R. would die if her trach was not suctioned and
changed timely and properly.  Mother was also informed that she would have to
wake up regularly to suction S.R.’s trach.

          Mother
reported at the meeting that she did not have a telephone and that she did not
have her own transportation in case S.R. had to be rushed to the hospital.  Mother
also said that she was not able to stay at the hospital as she had been asked
because she did not have enough gas money to drive back and forth from
Granbury, and the hospital staff informed her that Medicaid would pay for her
transportation.  The Medicaid representative at the meeting, however, said that
Mother had been using the Medicaid money to pay for meals at the hospital
instead of gas.  Medicaid had actually expired before the meeting but had been
extended because S.R. could not yet leave the hospital.  Cozart also testified
that Mother reported having to return to Granbury because the person she was
living with had threatened to throw her things away.

          Cozart
testified that there was a danger to S.R.’s physical health or safety when she
was removed by the Department.  Mother was not completing the required trach
training, and Cozart testified that Mother “was sleeping through alarms at the
hospital, the alarms would be going off saying that the baby needed to be
suctioned, and the hospital reported to me that she was sleeping through those
alarms.”  Cozart testified that the alarms only go off when there is “a
critical situation at hand” and that they go off to indicate “that the trach
had mucus or saliva in it[,] and it had to be suctioned because [S.R.] couldn’t
breathe.”  Cozart testified that, in addition to sleeping through the trach
alarms, the Department was concerned about Mother not having a telephone or her
own transportation in case of an emergency involving S.R.

          Cozart
testified upon questioning by the ad litem attorney that S.R.’s foster parents
underwent tracheotomy training for six or seven days and that they began their
training by “rooming-in” with S.R. at the hospital beginning the weekend after
she was removed by the Department.  She testified that Mother had had ample
time to complete the same training before removal and that Mother’s lack of
trach training was the Department’s primary concern.  S.R. could die without
proper care, Mother did not have a plan for ensuring proper care for S.R.,
Medicaid had expired so the hospital could not keep her any longer, and there
was not anyone else with whom S.R. could live.  Asked whether Mother
comprehended the severity of S.R.’s condition, Cozart responded, “At times I
felt like she did, but the overall picture of things, I don't think that she
really understood how serious it was.”  Cozart testified that, from her
investigation, Mother and J.R. were the only people willing and able to care
for S.R. and that S.R.’s presumed father was not involved in her life and did
not respond to the Department’s attempts to contact him.

          Cozart
acknowledged that Mother had appropriately taken S.R. to the hospital for her
respiratory problems before her admission in March 2010 and that Mother had
arranged for transportation when doing so.  She also testified that she thought
that Mother and J.R. had completed CPR training.  Cozart reiterated that the
concern was whether she would be able to care for S.R. upon S.R.’s discharge
from the hospital.  But Cozart acknowledged that Mother had appropriately cared
for S.R. before her March 2010 hospital admission and that Mother was not unfit
to parent a normal child, noting that Mother also had an older child who lived
with the child’s father and that she was pregnant with her youngest child at
the time of the investigation.

          Stephanie
Sherwood is a certified pediatric nurse at Cook Children’s Medical Center, and
she works in the transitional care unit into which S.R. was transferred after
her tracheotomy.  She testified that the transitional care unit’s “main goal is
education for the families on stabilizing the children and getting them home
with the families in a safe environment.”

          Sherwood
testified,

A trach is an artificial airway, and it is used to keep
the airway open.  It is the only source of an airway for these pulmonary
compromised children.  There are different reasons why you would get a trach. 
In [S.R.]’s case, she had pharyngeal hypoplasia, which in layman’s terms, a
floppy airway; and also stenosis, which is closing or stricturing of the
airway, so her airway was closed and smaller than it should be and it was also
floppy.  So it was not a very viable airway for her, so, therefore, she had a
trach placed, which is something that will keep it open and will be firm there
for her.  So it’s an airway that she [can] rely on.

Describing
S.R.’s medical condition that led to her March 2010 hospital admission,
Sherwood testified,

[S.R.] had a history of PDA, which is a patent ductus
arteriosus, is a hole in the heart which normally closes at birth or after
birth, but since she was a premie hers did not close so she had a ligation
which is where they go in and they close that hole, and that’s pretty typical
for premies.  With that operation you get mechanically ventilated, and that
sometimes can cause a little trauma to the airway.  She had this procedure done
and went home and was doing well, and then she came back to us with RSV, it’s a
respiratory virus, and that can range anywhere from just a runny nose to
wheezing, respiratory distress and respiratory failure.

          .
. . .

So she came in with RSV, she was wheezing, having
respiratory distress, trouble breathing, and already with her history of her
PDA.  Upon further investigation, diagnostic testing, they found this
subglottic stenosis, which is the stricturing or the narrowing of the airway,
and also the floppy airway or hypertonia of her airway.  With those things and
her continued respiratory distress, that all led to her getting a trach.

          Sherwood
further testified that irritants or smoke in the air exacerbates RSV, making
the condition worse, and that S.R.’s medical records indicate that she had been
exposed to smoking in Mother’s home.  She explained that the hospital requests
that parents avoid exposing these children to irritants such as smoking,
perfume, and animals that shed to avoid problems with compromised airways and
that not keeping the child away from irritants can be a dangerous situation for
the child.

          Sherwood
also described a common complication for children with a trach and the need for
the children’s caregivers to be properly trained.  She testified that the
“airway is only about the size of a drinking straw” and can be closed off very
quickly.  She also explained,

You can get a plug, which basically -- an easy way to
think about it is if you have -- you know, all of a sudden your nose gets
stopped up, you want to blow your nose so you can breathe.  Well, they can’t
clear that airway, so they can get a mucus plug in there, and it can totally
cut off their airway literally in seconds, so you have to attend to those
monitors.

          . . . .

If [S.R.] was alarming, her oxygen levels went low, her
color changed, she had a mucus plug, what would have to happen is the
caregivers would need to do a trach change, take out her trach, and put in a
new one, and then be able to make sure that that is snugly fit and secure, then
secure her airway and make sure that she’s doing well.  If she’s still not
doing well, then be able to administer CPR.  These are all expectations that
the family members or caregivers are expected to be able to do by themselves
because if the situation were to come up when they were at home, they would
have to be able to do that.

Sherwood
also described the need to suction the trach to clear the airway, even when
there is not complete blockage.

          Sherwood
testified that the nurses are required to document what occurs during the
child’s hospitalization, that the nurses’ notes would reflect whether a parent
was present, and that the notes would sometimes reflect when a parent was not
present.  Sherwood then read the following excerpt from the March 28, 2010
nurses’ notes:

On March 28th, mother and grandmother came to visit.  They
both informed the nurse that night that they were going to stay with [S.R.] all
night.  Mother held her and learned a few things about her care.  She seemed
very attentive.  Mother stated she was going to go for a walk with grandmother
out to the car and would be coming right back to patient’s room, and mother
never returned.

Sherwood
testified that Mother was at the hospital for one and one-half hours on March
28.

          Sherwood
testified that she spoke with Mother and J.R. on April 1, that she told them
that they needed to have trach training every day, and that they agreed to come
to training from twelve to two on weekdays and any time on weekends.  Sherwood
testified that the trach training is “very intense” but that the length of the
training varies with the specific medical needs of each child.  In general,
though, parents must be able to independently and without prompting perform
tasks such as suctioning the trach, changing the trach ties, changing the
trach, feeding, and responding to hypothetical emergency scenarios at least
three times before the “rooming-in” process starts.

          After
the conversation with Mother and J.R. on April 1, they did not return to the
hospital until April 6.  Sherwood testified that the hospital contacted the
Department on April 2 because Mother had set a time to come in but did not show
up or contact the hospital to make other arrangements.  She testified that
contacting the Department is not aimed at taking the child away from a parent
but is instead an additional resource for teaching the parents how to provide a
safe environment for the affected child.

          Mother
remained at the hospital from April 6 through 11, and Sherwood testified that
she would have received some training during that time.  However, she also
testified that a week is not enough time to become trach trained.

          The
nurses’ notes from April 19 state that S.R. was “alarming” on two separate
occasions—meaning S.R.’s “oxygen saturation is low, her heart rate is elevated
or low, or her respirations are low or elevated”—but that Mother was on the
computer, and J.R. was texting on her phone.  Neither responded to S.R.’s trach
alarm on either occasion, even though they were in the same room and had been
instructed that they must respond when the alarms go off.

          Sherwood
testified that Mother and J.R. always had to be prompted and told what to do
next and were not demonstrating the ability to “critically think and answer to
the alarms themselves.”  And Sherwood reiterated that the alarms mean that S.R.
required intervention because she was having trouble breathing and that the
required intervention could range from needing CPR to “coding,” which she
described as “need[ing] either life support or she’s going to die.”  S.R. might
also suffer brain injury.

          Sherwood
testified that S.R.’s foster parents participated in training shortly after
removal.  They were already trach-trained, but the hospital required that they
demonstrate their competence through successful trach changes and responses to
certain hypothetical scenarios.  Sherwood testified that the family was able to
demonstrate their skills very quickly because they had previous training.  The
hospital would not have released S.R. to the foster parents had they not
demonstrated their ability to care for her.

          Sherwood
also described some of the challenges parents face as children with trachs grow
and become more active.  As the children grow, they explore and try to pull out
the trach.  The trach must be replaced immediately

because the stoma, the hole where it’s placed, can close
up very quickly, within minutes, maybe even faster.  And if that were to close
up and if she didn’t have a very viable or a working airway, then she would not
be able to breathe, and at that point CPR would also have to be administered. 
So there still needs to be at least one caregiver with her at all times who is
trained and able to help her, especially now that she’s a toddler and pulling
on things and exploring things, and more active.

Sherwood
testified that S.R., at sixteen months old, could go into respiratory distress
within two or three minutes if her trach were removed or plugged.  She also
testified that several children had died after discharge from the hospital because
their caregivers did not follow hospital directives, did not stay with their
children at all times, or did not keep the children on monitors.

          Sherwood
testified, based on her observation of Mother and J.R. and her review of the
records, that she did not believe S.R. could be safely released to Mother and
J.R.  She said that they did not grasp that S.R. faces a life-or-death
situation each time her alarms go off or that immediate action is required.  Sherwood
testified that Mother and J.R. “were given the opportunity to have the
training, but they were lacking the critical skills and evaluation skills to do
so,” and she cited several factors involved, including not being at the
hospital to train; sleeping, texting, or using the computer when they were at
the hospital; and not comprehending the training that they received when they
participated, with all three being equally important.

          On
cross-examination, Sherwood agreed that she had personally shown Mother how to
change S.R.’s trach and that Mother had learned some of the skills for changing
and suctioning the trach.  She also agreed that the nurses’ notes reflect that
Mother on April 17 “prepared all bottles, provided all feeds, changed all
diapers, gave patient a bath, did a successful trach change, provided trach
cares, repositioned patient as needed, and attended to all alarms.”  Sherwood
acknowledged that Mother was, on that day, doing what the hospital staff was
asking her to do, but she said that there were still concerns and that Mother
never had a “clear breakthrough” in her ability to care for S.R.

          Sherwood
testified that Mother was not completely unable to care for S.R. but that she
provided inconsistent care.  She said the hospital was attempting “an extended
kind of intense rooming-in” training with Mother, which required Mother to be
at the hospital twenty-four hours per day, seven days per week for as long as
possible because S.R. was medically ready for discharge.  But Sherwood
testified that Mother and J.R. had not satisfactorily completed the training,
and S.R. could not be discharged to Mother, even if she completed the training,
because S.R. needed a second, trained caregiver.

          Sherwood
testified that, moving forward, it is important that S.R. live in a clean
environment.  The home evaluation is part of that process.  Looking at
photographs of Mother’s one-room residence, Sherwood testified that it did not
appear to be a safe environment for S.R.  From the pictures, Sherwood expressed
concern about Mother’s ability to provide for S.R.’s nutritional and medical
needs because there was no working refrigerator, which would be used to store
food and medicine, and because there could be a problem with temperature
control, which would exacerbate S.R.’s breathing problems.  Sherwood
acknowledged, however, that parents with little income might often live in
small places with others and that doing so does not equate to being a bad
parent or unsafe living conditions.  Even so, Sherwood testified that the
hospital staff was concerned about what would happen to S.R. if she were
allowed to go home with Mother.

          Dianna
Cook served as the primary Department caseworker for S.R. and Mother from the
time of S.R.’s removal through January 2011.  Cook testified that the
Department’s initial plans were family reunification and offering services to
Mother to achieve reunification.  Cook testified that Mother was pregnant
during the pendency of the case, that she did not finish high school, and that
she was also caring for her older child at some point after the case began.

          Cook
testified that there was a group conference in June 2010.  Mother attended the
meeting and signed off on the “Family Group Conference – Plan” developed at the
meeting.  On the plan document is a list of family strengths.  Included in the
list are that there is “[a] lot of support from [J.R.],” that the “family loves
and cares about [S.R.],” that the “family is able to have a good relationship
with the foster parent,” that the “family is able to rely on [the] foster
family” for support, that it is a “[r]eally close family,” and that the “family
wants what is best for [S.R.].”

          Also
on the plan document is a list of the tasks Mother was required to complete
from her service plan to regain custody of S.R.  First on the list is to
receive medical training to care for S.R., and Cook advised Mother that she
could visit S.R. any time she was in the hospital and that Mother could receive
additional training when doing so.  Cook said that S.R. was hospitalized “a
couple of times” after her removal and that she contacted Mother each time to
let her know, but Mother did not visit the hospital at any times other than the
regularly-scheduled bi-weekly visitations.  Mother did not “room-in” with S.R.
at the hospital to receive trach training, and Cook testified that Mother had
not given her any other indication that she and J.R. had completed, or even
attempted, trach training after S.R.’s removal in April 2010.

          Cook
also testified about a permanency plan progress report dated September 30,
2010.  The report states that, as of September 25, 2010,

[S.R.] continues to be medically fragile and requires
caregivers who are appropriately trained to care for her.  Failure to do so
could result in her death.  [Mother] does not seem to understand the serious
nature of [S.R.]’s condition.  She has not shown an interest in participating
in services that will provide the skills necessary to properly care for
[S.R.].  [Mother] has not provided evidence that she has the skills necessary
to provide the quality of care that [S.R.] requires.  [Mother] has not provided
the Department with any evidence that she has completed training and/or that
she is capable of providing the medical attention that [S.R.] requires.  [Mother]
does not seem to realize the amount of attention that [S.R.]’s condition
requires.  [Mother] has not kept in regular communication with her caseworker
or the Department.  She does not seem to be taking her service plan seriously
as very little effort has been made towards completion of services.  [Mother]
has minimally participated in services and she has not shown the initiative to
learn about [S.R.]’s special medical needs.

By
the time of this permanency plan, the Department’s permanency goal for S.R. had
changed to adoption by a non-relative.

          Cook
also testified about the permanency plan progress report dated January 19,
2011.  Mother had completed parenting classes by that time but had not
completed other parts of her service plan.  The progress report states: 
“Although [Mother] has completed parenting classes, she has not provided
evidence of the medical training necessary to properly care for [S.R.].  She
has not participated in other services besides the parenting classes.”

          Cook
testified that Mother did not maintain regular contact with her as required by
her service plan and that Mother affirmatively contacted her only one or two
times.  Mother also did not attend counseling, obtain employment, or locate
stable housing.  Cook explained that Mother was repeatedly informed at court
hearings and in the service plan itself that her failure to complete her
service plan could lead to the termination of her parental rights to S.R.

          Cook
visited Mother’s home in October 2010.  Cook described the home as “a single
room that had a bathroom adjoined to it.  But there w[ere]n’t any kitchen
facilities or . . . bedding that would be appropriate for a baby, and it
just . . . really wasn’t a home,” and she testified that she
“wouldn’t call it a home where you would have, you know, appropriate places for
children.”  Cook further testified that although Mother had not informed her
each time she moved, Mother had lived in at least two other places during the
pendency of the case.  She said this is not stable for S.R. compared to the
permanency S.R. would experience if she were adopted.  Cook said that she did
not know whether Mother was able to afford different housing.

          Cook
said that S.R. is currently in foster care in Royse City, approximately sixty
miles east of Dallas, and that Mother did not have her own transportation but
was transported to visitations by the Department.  When S.R. was hospitalized
after removal, she was at Children’s Medical Center in Dallas, which is an hour
or hour and one-half drive from Granbury.  Mother visited S.R. at the hospital
during regularly-scheduled visitation times but did not otherwise visit the
hospital.  Cook testified, however, that the Department would have honored
Mother’s reasonable requests for transportation to the hospital outside
scheduled visitations had she requested it.

          Cook
testified that the Department intends to seek adoption for S.R. and that she
believes S.R. is adoptable.[5]  She further testified
that if Mother’s parental rights were not terminated, that outcome would not be
in S.R.’s best interest because the Department would likely be named managing
conservator, meaning S.R. would remain in the foster care system until she was
eighteen years old.  Cook testified that Mother had been given “every
opportunity” to complete her service plan but acknowledged that Mother might
have completed parts of her service plan after she was no longer working on the
case.

          Rebecca
Farquhar is a Department caseworker and was assigned this case two months
before trial and after Jennifer Bond served as caseworker for about one month.  Describing
her activity as caseworker, including a meeting with Mother just before trial,
Farquhar testified,

I made a home visit to her home in March and spoke with
[Mother] about what services she had done.  She had recently asked me to set
her up with a brand new counselor as well as to re-get the number to do a drug
and alcohol assessment, neither of which she had done.  I did give her a new
number for a counselor as well as a number to do the drug and alcohol
assessment, and she had just set those up when I went out for the home visit in
March.

          Farquhar
described Mother’s home as “very, very small” and said that it is “a trailer
with four homes in it, I guess you would call them apartments.”  The room is
“approximately 10-by-10, maybe 12-by-12, has a double bed in it, a couch, a
coffee table, and a pack and play for [her three-year-old son K.R.].”  The
refrigerator is not working, and the microwave is the only way to cook food.  Mother,
K.R., and J.R. live in the home, and J.R.’s daughter lives there every other
weekend.  Mother’s youngest child, born during the pendency of the case, also
lives there “every week or two.”  Thus, even without S.R., there might be five
people living in Mother’s home at certain times.  Farquhar testified that
Mother’s home is not a safe living environment for a child with S.R.’s special
medical needs because S.R. needs cleanliness, safety, and a place to sleep.  She
stated, however, that the home’s size is not necessarily the concern because
the Department routinely works with families without the resources to afford
large homes.

          Concerning
Mother’s incomplete service plan, Farquhar testified that Mother had not made
any of her $100 per month child support payments and also had not maintained
appropriate and safe housing, obtained a legal source of income for at least
six months,[6] completed medical training,
maintained regular contact with the Department, or consistently attended
parental visitations.  Farquhar testified that Mother missed several
visitations and that Mother’s excuses included forgetting about the
regularly-scheduled visit and oversleeping.  Farquhar also testified that
Mother had not provided doctors’ reports following her prenatal visits for her
pregnancy with her youngest child.

          Mother
had previously completed parenting classes and had undergone a substance abuse
assessment just before trial.  Mother had also started attending counseling a
few weeks before trial but had not completed it, and Mother had been discharged
by her first counselor because she had missed several sessions.

          Farquhar
also testified that she was concerned about S.R.’s safety when she is around
K.R. because K.R. had attempted to pull S.R.’s trach out during visitations.  Farquhar
said that K.R. is “a rowdy little child” with “a lot of energy,” and Mother is
his primary caregiver.

          Tori
Foster is a Department case aide who assists with transportation for parents to
attend visitations with their children.  Foster transported Mother to the
majority of the visitations.  The visitations were scheduled for every other
Friday, and Foster testified that she texted Mother the night before to remind
her of the visitations, even though she was not required to do so.

          Foster
said that she and Mother talked during the drives between Granbury and Dallas. 
She testified that from her perspective, Mother feels that she is “doing
wonderful on her services,” does not understand why S.R. has not been returned
to her, and feels that she is ready to have S.R. back in her home.  Foster also
testified that there is a disconnect between what needs to be done for S.R. and
what Mother believes should be done and that Mother’s maturity level could be
contributing to the disconnect.

          Foster
testified about a calendar that she prepared to show the visitation schedule
and the visitations that Mother attended or missed.  Of twenty-five possible visits,
Mother attended fifteen.  One visit was cancelled because S.R. was sick, two
were cancelled because K.R. was sick, one was cancelled because Mother was
sick, two others were cancelled because Mother gave birth to her youngest
child, one was cancelled because of weather, and another was cancelled for a
reason unknown to Foster.  Foster agreed that S.R. could not have people around
her who were sick and that cancellations for sickness were appropriate.  Mother
also missed a visitation in August 2010 because she overslept and a visitation
the month of trial because she was tired and forgot about the visitation.

          Foster
testified that she observed the visitations each time that she transported
Mother.  Beginning with the July 9, 2010 visitation, Mother had K.R. with her
at most of the visitations.  Mother also had her youngest child with her at the
last visitation before trial, and Mother asked Foster to take pictures of her
with her children for use in court.[7]

          Foster
also testified that she took a video of the last visitation because K.R.’s
behavior was very problematic.[8]  Foster testified that
K.R. is a “very high-strung child, and [Mother] has had a lot of problems in
the past with him trying to keep him calmed down so she could visit with
[S.R.].”  Foster testified that K.R. “was extremely, extremely bad” at this
particular visit, saying, “He was throwing toys, he was jerking bins off of the
toy box, cutting lights off, running down the hallway, so I just decided, you
know, that I needed to record those.”

          During
this particular two-hour visitation, Mother held S.R. for approximately ten
minutes.  Near the end of the visitation, Mother picked S.R. up, and S.R. began
crying.  While S.R.’s reaction was not necessarily abnormal, Mother just handed
S.R. back to her foster mother rather than caring for her or trying to calm
her.  Mother also had the nurse or foster mother suction S.R.’s trach the
majority of the time.  Foster testified that there is “very little” bond
between S.R. and Mother; that S.R., now that she is crawling, does not allow
Mother to hold her very much; and that S.R. is, in contrast, very bonded with
her nurses and foster mother.  Mother also does not show emotion when the
visitations are over.  Foster acknowledged, however, that Mother had only seen
S.R. for approximately four hours each month for the previous year.

          Foster
testified that the visitations revolve mostly around K.R. because his behavior
takes Mother away from interacting with and caring for S.R.  Foster also
testified that S.R.’s nurse had intervened in a prior visitation because K.R.
was trying to take out S.R.’s trach.  Foster said that she had also intervened
during visitations because K.R. was throwing toys near S.R. and reaching for
her trach.  Mother does not, however, redirect K.R. to let him know that he
cannot touch the trach.  Even so, Foster said she does not believe K.R. is
deliberately trying to hurt S.R.  Foster testified that it is good for K.R. to
attend the visitations so that he can bond with S.R., but she also said that
Mother was warned that he would not be able to attend future visitations if he remained
aggressive toward S.R.

          Foster
was asked, based on her observations of Mother and S.R. and Mother’s home, what
could happen to S.R. if she were returned to Mother, and Foster testified,

          From my own personal opinion and watching the
visits, looking, I’ve been in [Mother’s] home, the conditions that she lives in
and stuff, I personally believe that [S.R.] would not live for a month if she
was returned home.  And I truly in my heart believe that.  I know that [Mother]
loves [S.R.], I mean I have no doubt that she loves [S.R.], but she did not do
the training that she needed.  I do not think she has the capability to take
care of [S.R.].

          [S.R.] is a very special little girl that needs
a lot of love, a lot of help, and I just do not believe that [Mother] could do
that for her.

          Foster
testified that termination of Mother’s parental rights is in S.R.’s best
interest, and she expressed concern for S.R.’s safety if she were returned to
Mother.

          Cheri
Locke is a licensed vocational nurse who practices pediatric home health.  She
provides care to S.R. every other Friday and has done so for the two or three
months before trial.  Locke testified that she is very attached to S.R. because
she spends the entire day with S.R. and takes her to visitations.

          Locke
described S.R. as a very friendly baby, but she testified that there is no bond
between her and Mother.  S.R. allows Mother to play with her, though, and Locke
testified that Mother seems to genuinely care about S.R.

          Locke
also described an incident involving K.R. at one visitation when he grabbed
S.R.’s trach.  She described K.R.’s action as “a grab with the intent to pull
it out and so it was to where I couldn’t pull his hand off of the trach, I had
to hold his hands stable to keep him from being able [to] pull the trach out.”  Locke
continued,

          If [K.R.] pulled the tube out, [S.R.] would go
into respiratory distress really quickly, so it would be a matter of getting that
new trach back in as quickly as possible.  And you’re working against the fact
that [S.R.] is very feisty and she’s fighting against you, too.  So she’s going
to be moving all around because she doesn’t want you messing with it, and then
you have to get this back in.  And on the trach there’s two holes on the end
where you have to -- they’re ties, that actually holds it around her neck. 
You’re doing all of this one-handedly, and it’s difficult for me, as a nurse,
and I’ve been trained to do it.  But all of this has to happen very quickly
because [S.R.] goes from one extreme to another very quickly.

          Locke
testified that there have been occasions when S.R. had pulled out her own
trach, but that if the trach is pulled out, the trach must be replaced within
minutes.  Locke said that this emergency situation will happen and that it is a
question of how often it will happen, and she testified that it may occur more
often as S.R. ages because older children get curious about the trach and try
to pull it out themselves.  Locke also testified that Mother’s failure to get
the proper training was neglectful.

          Locke
testified that K.R.’s rambunctious behavior complicated the situation and that
his natural, two-year-old curiosity presented a danger to S.R.  She expressed
concern about Mother’s failure to intervene when K.R. acted inappropriately
toward S.R. and said that Mother only told K.R. that his action might “hurt
sissy.”  Locke said that Mother’s attention is generally directed toward K.R.
during visitations because he is “running around,” and she has to “make sure
he’s not going out the door.”  Locke explained that S.R. could die if something
were to happen to her trach and that she is concerned that Mother “would ignore
how important this trach is, this is how the baby’s breathing, and not really
understand that you have to be very mindful of everything about this trach
because she doesn’t have a choice, she has to have it.”  Locke acknowledged,
however, that the danger of someone pulling out S.R.’s trach, whether it be
K.R. or S.R., would remain an ongoing danger for S.R.  Her concern for S.R.,
though, is that Mother would not be attentive to the danger.

          Bob
Marston is a court-appointed special advocate (CASA), and he and his wife
served as S.R.’s co-CASAs.  Marston described his CASA role as conducting an
investigation by talking to the parties involved, writing reports for the court
based on the information gathered, and “try[ing] to determine what is the best
interest of [S.R.].”

          Mother
told Marston in June 2010 that she had never been employed.  She also said that
she did not have a driver’s license or a car.  Marston also testified that he
had visited Mother’s home, and he expressed concern about having sufficient
space for S.R. and her necessary medical equipment.

          Marston
also testified about what he believes is in S.R.’s best interest, saying that
he

formed a very strong opinion based on the entire
investigation, and that’s -- I’ve talked to a lot of people during the months
since we’ve got the case, and I feel strongly that it would not be in [S.R.]’s
best interest to be returned to [Mother].  I think it would be extremely
detrimental to her health, and I do not believe she would survive if she were
returned.

          Marston
testified that termination of Mother’s parental rights to S.R. is in S.R.’s
best interest.  Marston discussed the reasons for his opinion, specifically
citing Mother’s failure to complete medical training and her inability to appropriately
care for S.R.  Marston testified that he does not doubt Mother’s love for S.R.,
but he said that he does not believe S.R. will live if Mother’s parental rights
are not terminated and that, to him, seeing S.R. survive overrules other
concerns he has about the consequences of terminating Mother’s parental rights
to S.R.

          Mother
testified that she completed tenth grade but did not have a high school diploma
or GED.  Her third child was born in October 2010 during the pendency of this
case, and she was two-months pregnant with that child during S.R.’s hospitalization
in March 2010.  Mother testified that being pregnant hurt her ability to find a
job.

          Mother
testified that she was happy when she learned she was pregnant with S.R. and
that she regularly attended her prenatal visits.  Mother testified that S.R. was
born six weeks prematurely and that she did not know before S.R.’s birth that
she had a heart defect.  She first learned of S.R.’s heart murmur when S.R. was
hospitalized at three and one-half months old for RSV.  Mother took S.R. to the
hospital in Granbury, but S.R. was transferred to Cook Children’s in Fort
Worth.  Mother testified that S.R. was hospitalized for two weeks for heart
surgery and that she developed the floppy airway because the tube in her throat
was not properly lubricated, and tissue grew around it.  Mother testified that
she slept in S.R.’s room during that hospitalization and that she never left
the hospital.

          Mother
said that she took S.R. to the hospital again a few weeks later because she was
breathing sporadically.  Regarding the calendar prepared to reflect her
absences from the hospital, Mother denied being absent as much as had been
represented, testifying that she was at the hospital around the clock beginning
at the first of April.  She testified that she was always in S.R.’s room other
than when she went to get something to eat or to visit her grandmother in a
nearby hospital.  It was during this hospitalization that S.R. had the
tracheotomy, and Mother testified that she began the training to learn to
suction S.R.’s trach.  Mother described the process of suctioning the trach,
changing the ribbon around the trach, and changing the trach, and she testified
that she performed those tasks multiple times at the hospital.  Mother
testified that she completed the training other than the rooming-in portion.

          Mother
admitted knowing that she had to complete the medical training to care for
S.R., but she said that she never had the gas money to go to Fort Worth for the
training.  She also testified that no one informed her of the option of
training with S.R. each time S.R. was hospitalized.  Mother testified that J.R.
would be S.R.’s second caregiver, but she admitted that J.R. had also not
completed the medical training.  In a different part of her testimony, Mother
claimed that she and J.R. should have certificates of completion at Cook
Children’s Hospital because they had completed all the training offered by the
hospital.  Mother said she is capable of caring for S.R., even without further
training, but she later testified that it is best for S.R. to be with someone
who knows how to care for her and that she did not presently know how to care
for S.R.  In yet another part of her testimony, Mother said that she thought
she should have more medical training, saying that she had “done the training. 
I just haven’t done the rooming-in.”  But Mother also testified that she blamed
herself for not going to the hospital during S.R.’s two most recent
hospitalizations to complete additional training.

          Mother
expressed understanding that the primary issue with S.R. is her “very serious
medical condition” and that whoever cares for her must be able to react quickly
and know exactly what to do because S.R. could die.  Mother said that she knows
what to do if S.R.’s trach were pulled out and that she could provide S.R. with
her undivided attention twenty-four hours per day, seven days per week.  She
testified that this would be possible because she has J.R. to help her.  Mother
specifically disagreed with Sherwood’s testimony about her not responding to
S.R.’s alarms at the hospital and testified that she had suctioned S.R.’s trach
during visitations every time it was needed.

          Mother
also testified that she understood S.R. to have major respiratory problems, but
she denied that she had been told not to smoke around her.  After initially
denying that J.R. smoked around S.R., Mother admitted that J.R. had sometimes
smoked inside the house.  Mother acknowledged smoking but denied ever smoking
in the house or around S.R.

          Mother
testified that she did not pay child support for S.R. as required by her
service plan because she was unemployed, even though she knew that finding
employment was another requirement of her service plan.  Mother testified that
she had submitted about twenty applications for employment but had only had the
one job for eight days.  Mother also acknowledged past marijuana use and a
marijuana-related conviction, but she denied current use of marijuana or other
controlled substances.

          Mother
acknowledged that her home is small and said she was not sure how she would
accommodate S.R.’s medical equipment in the small space, but she testified that
she planned to find a larger place by using public assistance.  Mother admitted,
however, that she had not given the housing authority the information needed to
apply for housing.

          Mother
denied that S.R. cries when she holds her during visitations and testified that
she does not hold S.R. the entire visitation because she is “a very busy little
girl.  I’m not going to sit there and hold her down to where she can’t play.”  Mother
also testified that although K.R. is two years old and active, she is able to
sufficiently concentrate on all of her children, including S.R., at the same
time.  Mother acknowledged that K.R. “can be a handful,” but she said that he
is trying to be affectionate toward S.R. and that she has talked with him about
not touching S.R.’s trach.

          Mother
said that she has a lot of family in the area to provide her with assistance
and support, especially J.R., her brother, sister, and sister-in-law.  Mother
testified that J.R. wanted to attend the visitations with S.R. but was unable
to because of her work schedule.  Mother also said that K.R. primarily lives
with her and that her youngest child is with her about half of the time.

          Mother
testified that she submitted to the required drug and alcohol assessment the
month before trial but agreed that she did not do so within the time frame mandated
by her service plan.  She said that she attended parenting classes and that she
had started counseling, but she denied that she was at fault for being
discharged by her first counselor.

          Mother
testified that she loves S.R. and that she has tried to provide her with
appropriate care the best that she can.  She testified that it is not in S.R.’s
best interest for her parental rights to be terminated and that she wants to
have S.R. grow up with her and to know her biological family.  Mother testified
that she hopes S.R. will again live with her in the future.

          J.R.
is Mother’s mother and S.R.’s grandmother.  J.R. testified that Mother did
everything that was required to care for S.R. before her hospitalization in
March 2010 and subsequent removal.  J.R. described Mother as a loving mother
who cares for her child.  J.R. testified that she and Mother completed their
medical training except for the rooming-in, but she admitted in later testimony
that she and Mother had not completed the training.

          The
trial court instructed the jury, in part, as follows:

For the parent-child
relationship to be terminated in this case, it must be proved by clear and
convincing evidence either –

 

1.  That [Mother] engaged in conduct that endangered the
physical or emotional well-being of [S.R.]; or[[9]]

2.  That [Mother]
failed to comply with the provisions of a court order that specifically
established the actions necessary for [Mother] to obtain the return of [S.R.]
who has been in the permanent or temporary managing conservatorship of the
[Department] for not less than nine months as a result of [S.R.]’s removal from
[Mother] for the abuse or neglect of [S.R.].

          The
jury unanimously answered “yes” to the broad-form question that inquired
whether the parent-child relationship between Mother and S.R. should be
terminated.  The trial court entered judgment accordingly.

III. 
Statement of Points for Appeal

          In
2008, in an en banc decision, this court held that former family code section
263.405(i) is “void as a violation of the separation of powers provision of the
Texas constitution.”  In re D.W., 249 S.W.3d 625, 645 (Tex. App.—Fort
Worth) (en banc), pet. denied, 260 S.W.3d 462 (Tex. 2008) (per curiam). 
Specifically, we held in D.W. that section 263.405(i)

is void because it violates the Separation of Powers
Clause of the constitution to the extent that it forecloses our power to review
issues properly preserved for appeal because the statute unduly interferes with
our substantive power as an appellate court to rehear and determine issues on
the merits that were decided in the court below.

Id. at
640; see also In re A.J.M., No. 02-11-00137-CV, 2012 WL 2877457, at
*1 (Tex. App.—Fort Worth July 16, 2012, pet. denied) (op. on reh’g) (en banc).[10] 
Thus, if an issue was properly preserved for appellate review in the trial
court in compliance with the rules of civil and appellate procedure, section
263.405(i) unconstitutionally interferes with our constitutionally conferred
power to review the issue on the merits on appeal.  D.W., 249 S.W.3d at
640, 645.  Therefore, because Mother’s complaints were properly preserved in
the trial court by including them in her timely motion for new trial, we
decline the Department’s request that we summarily overrule them for failure to
include them in a timely-filed statement of points under section 263.405(i).

IV. 
Standards of Review

          A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  “While parental
rights are of constitutional magnitude, they are not absolute.  Just as it is
imperative for courts to recognize the constitutional underpinnings of the
parent-child relationship, it is also essential that emotional and physical interests
of the child not be sacrificed merely to preserve that right.”  In re C.H.,
89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State seeks not just
to limit parental rights but to erase them permanently—to divest the parent and
child of all legal rights, privileges, duties, and powers normally existing
between them, except for the child’s right to inherit.  Tex. Fam. Code Ann.
§ 161.206(b) (West 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize termination proceedings and strictly construe
involuntary termination statutes in favor of the parent.  Holick, 685
S.W.2d at 20–21; In re R.R., 294 S.W.3d 213, 233 (Tex. App.—Fort Worth
2009, no pet.).

          In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001; In re
J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex. Dep’t of Human Servs. v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34 S.W.3d 625, 629 (Tex.
App.—Fort Worth 2000, pet. denied) (op. on reh’g).

          Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001; see also id. § 161.206(a).  Evidence is
clear and convincing if it “will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be
established.”  Id. § 101.007 (West 2008).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002); see In re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007)
(contrasting standards for termination and modification).

          In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in
the light most favorable to the finding and judgment.  Id.  We resolve
any disputed facts in favor of the finding if a reasonable factfinder could
have done so.  Id.  We disregard all evidence that a reasonable
factfinder could have disbelieved.  Id.  We consider undisputed evidence
even if it is contrary to the finding.  Id.  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.  Id.

          We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573, 574.  And even when credibility issues appear in the appellate record, we
defer to the factfinder’s determinations as long as they are not
unreasonable.  Id. at 573.

          In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the verdict with our own.  In
re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the
entire record, a factfinder could reasonably form a firm conviction or belief
that the parent violated subsections (E) or (O) of section 161.001(1) and that
the termination of the parent-child relationship would be in the best interest
of the child.  Tex. Fam. Code Ann. § 161.001; C.H., 89 S.W.3d at
28.  If, in light of the entire record, the disputed evidence that a reasonable
factfinder could not have credited in favor of the finding is so significant
that a factfinder could not reasonably have formed a firm belief or conviction
in the truth of its finding, then the evidence is factually insufficient.  H.R.M.,
209 S.W.3d at 108.

V. 
Endangerment

          In
part of her first issue, Mother argues that the evidence is legally and
factually insufficient to support termination under family code section
161.001(1)(E) and (O).[11]

          “Endanger”
means to expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d at
533; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no
pet.).  Under section 161.001(1)(E), the relevant inquiry is whether evidence
exists that the endangerment of the children’s physical well-being was the
direct result of the parent’s conduct, including acts, omissions, or failures
to act.  See J.T.G., 121 S.W.3d at 125; see also Tex. Fam. Code
Ann. § 161.001(1)(E).  Additionally, termination under (E) must be based on
more than a single act or omission; the statute requires a voluntary,
deliberate, and conscious course of conduct by the parent.  J.T.G., 121
S.W.3d at 125; see Tex. Fam. Code Ann. § 161.001(1)(E).  It is not
necessary, however, that the parent’s conduct be directed at the children or
that the children actually suffer injury.  Boyd, 727 S.W.2d at 533; J.T.G.,
121 S.W.3d at 125.  The specific danger to the children’s well-being may be
inferred from parental misconduct standing alone.  Boyd, 727 S.W.2d at
533; In re R.W., 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet.
denied).

          Mother
argues that she did not cause S.R. to need the tracheotomy and that the danger
to S.R. arises from S.R. “now being medically fragile as a result of the
tracheotomy.”  Mother also argues that she is not the source of the danger to
S.R. and that she did not engage in a course of conduct as required for there
to be endangerment under section 161.001(1)(E).  Mother also argues that “[t]he
evidence at trial was uncontroverted that [she] had made significant efforts to
learn each of the trach skills needed to care for S.R. and had been able to
demonstrate those skills in the hospital.”  She further contends that the fears
expressed by trial witnesses that she cannot properly care for S.R. are “the
type of abstract fear of what might happen, i[.]e. ‘metaphysical injury’ which
is an impermissible basis under subsection E.”  While the evidence presented at
trial was largely contested and conflicting, Mother focuses only on evidence
favorable to her position and minimizes the other evidence supporting the
jury’s verdict.

          We
do not repeat it at length here, but the evidence presented to the jury rises
above abstract concepts of danger or metaphysical injury to S.R.  The jury
heard detailed testimony about the severity of S.R.’s medical condition, the
distinct possibility that S.R. could go into respiratory distress (and possibly
die) within minutes if her trach were not suctioned or changed timely and
appropriately, and Sherwood’s recitation of other children with similar medical
conditions who had died after being discharged from the hospital because their
caregivers did not properly care for them.  The jury also heard evidence that
Mother, despite being repeatedly informed by hospital personnel of the need to
be properly trained to care for S.R., went days without returning to the
hospital and failed to engage in training or otherwise attend to S.R.’s needs when
she was not absent from the hospital, failing to respond to S.R.’s alarms even
when she was in the same room.  Department personnel also discussed the need
for medical training with Mother, including the medical training in both the
initial family group conference plan and the formal service plan.

          Mother
was also warned at each court hearing that her failure to complete medical
training (and all other parts of her service plan) could lead to termination of
her parental rights.  Cook, Sherwood, and Foster each testified that Mother
does not comprehend the severity of S.R.’s medical condition, and although
eleven months had passed since S.R.’s removal, Mother did not complete or even
attempt any additional medical training.  There was also testimony that Mother’s
older child is rambunctious, active, and curious, and that he presents a danger
to S.R., the severity of which Mother does not seem to comprehend.

          Contrary
to Mother’s contentions, the jury heard evidence by which it could have
determined that Mother engaged in a course of conduct that endangers S.R.’s
physical or emotional well-being.  In that regard, the evidence in this case is
similar to that presented in In re J.O.C., 47 S.W.3d 108, 110–11, 113–14
(Tex. App.—Waco 2001, no pet.), disapproved by J.F.C., 96 S.W.3d at 267 & n.39.[12] 
The J.O.C. court summarized the evidence concerning endangerment under
section 161.001(1)(E) as follows:

[T]he jury could
conclude that Stephanie engaged in a similar course of conduct.  First,
testimony showed that Stephanie’s conduct endangered the physical well-being of
the child.  Stephanie’s child was medically fragile, with feeding difficulties,
a propensity to stop breathing, and susceptibility to infection.  However, she
did not prepare for the hospital’s release of her child by learning basic
feeding techniques.  A caseworker testified that Stephanie acted as if she
“didn’t really care” to learn about the sleep apnea monitor (an alarm that
warned when the child had stopped breathing).  She did not attend the CPR class
that is required for all parents of premature babies.  She did not learn
preventive care to counter the respiratory infections that her child is
susceptible to.  The child’s doctor wrote in his chart: “It is clear to me at
this time that mom cannot care for this infant.  Unless something changes
drastically, I cannot medically discharge this infant to mom’s care.  Mom must
show some initiative that she will be able to cope with the obstacles involved
in caring for this preemie infant.”

 

          Testimony
indicated that Stephanie had several opportunities to show some initiative.  The
hospital offered to provide room and board and to pay for her transportation to
Waco.  She did, in fact, accept the offer of help on three occasions, but chose
to watch television in her room most of the time rather than work with her
child.  Stephanie signed a safety plan with the Child Protective Services
caseworker agreeing to visit the child for at least one feeding on a daily
basis while the child remained in the hospital.  She did not follow through
with the plan.  Dr. Shinder, a licensed clinical psychologist, testified that
he asked Stephanie to complete several small tasks for the benefit of the
child, such as to check out a library book on child care and to call the
government program Chronically Ill and Disabled Children for referrals.  Stephanie
failed to comply with any of his requests.  Although Stephanie did not actually
injure the child physically, her conduct put him at great risk of physical harm
had he been released to her.  Dr. Shinder commented that had the child been
sent home from the hospital with Stephanie, he would not have survived.

 

          Second,
Stephanie exhibited a course of behavior showing her inability to deal with
J.O.C.’s emotional and developmental needs.  The unrebutted testimony is that
bonding between parent and child is essential to the emotional health and
development of the child.  Stephanie visited her child three times while he was
in the hospital and showed up for only about half of the scheduled visits after
he was moved to a foster home.  Three witnesses, all employees of Child
Protective Services who had observed Stephanie’s visits with the child,
testified that Stephanie had little interaction with her child.  According to
the visitation supervisor, Stephanie spoke to her child four times over a
period of one and a half years: “Come here;” “Don’t throw that;” “Quit hitting
yourself in the head;” and “Do you want that?”  Other testimony revealed that
Stephanie kept J.O.C.’s body away from her own.  She avoided face-to-face
contact with him. J.O.C. exhibited no reaction to Stephanie when she entered
the room for her visitation, and Stephanie did nothing to elicit any response
from her child.  According to Dr. Shinder, Stephanie could not answer his
questions about her child and has not bonded with J.O.C.

J.O.C., 47
S.W.3d at 113–14.  While Mother did not cause S.R. to need a tracheotomy, the
jury could have determined, as the jury did in J.O.C., that Mother
endangered S.R. through her failure to obtain the appropriate medical training
despite repeated admonitions, instructions, and warnings during the eleven
months following S.R.’s removal.

          Viewing
all the evidence in the light most favorable to the termination judgment, and
disregarding all contrary evidence that a reasonable factfinder could
disregard, we hold that the evidence is legally sufficient to support a
factfinder’s firm conviction or belief that Mother engaged in conduct that
endangered S.R.’s physical or emotional well-being.  See Tex. Fam. Code
Ann. § 161.001(1)(E); J.P.B., 180 S.W.3d at 573.  Likewise, giving
due deference to the factfinder, we hold that the evidence is also factually
sufficient to support the jury’s finding that Mother engaged in conduct that
endangered S.R.’s physical well-being.[13]  We therefore overrule
this part of Mother’s first issue.

VI. 
Best Interest

          In
the remainder of her first issue, Mother argues that there is legally and
factually insufficient evidence that termination of her parental rights is in
S.R.’s best interest.[14]

A. 
Applicable Law

          There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  Nonexclusive factors that the trier of fact in a termination case may
use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical
needs of the child now and in the future;

(C)     the emotional and physical
danger to the child now and in the future;

(D)     the parental abilities of
the individuals seeking custody; 

(E)     the programs available to
assist these individuals to promote the best interest of the child;

(F)     the plans for the child by
these individuals or by the agency seeking custody;

(G)     the stability of the home
or proposed placement;

(H)     the acts or omissions of
the parent which may indicate that the existing parent-child relationship is
not a proper one; and

(I)      any excuse for the acts or
omissions of the parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations
omitted).  These factors are not exhaustive; some listed factors may be
inapplicable to some cases; other factors not on the list may also be
considered when appropriate.  C.H., 89 S.W.3d at 27.  Furthermore,
undisputed evidence of just one factor may be sufficient in a particular case
to support a finding that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each factor will
not support such a finding.  Id.

B. 
Analysis

          Mother
points to the strong presumption that keeping a child with her parent is in the
child’s best interest, and she argues that the evidence does not present a
causal connection between her conduct and the danger to S.R.’s health or
welfare.  Mother further contends that termination of her parental rights is
based on speculation about possible harm to S.R. and is merely an attempt to
relocate S.R. to more educated, prosperous caregivers.  Finally, Mother points
to evidence that S.R. was removed from her care after S.R. was hospitalized for
only one month despite testimony that the hospital works with other parents on
medical training for as long as a year.  Again, however, Mother’s arguments
largely ignore contradictory evidence.

          As
before, we generally discuss without repeating the evidence at length.  S.R. is
too young to have expressed any desire concerning the termination of Mother’s
parental rights, but the jury heard testimony that she is a friendly child who
bonds easily with others.  Witnesses testified, however, that Mother and S.R.
are not bonded despite Mother’s unquestioned love for S.R.  The lack of a bond
is somewhat explained by Mother’s limited access to S.R. given the visitation
schedule and physical distance between their homes.  But Mother did not seek
additional time with S.R. when she was hospitalized, was not emotional at the
end of visitations, and did not contact the Department to inquire about S.R.’s
well-being between visitations.  Mother also did not attend to S.R.’s needs
during the visitations or hospitalizations, requiring others to care for S.R.
instead.

          Moreover,
S.R. is medically fragile and requires constant, undivided attention from
caregivers qualified to provide appropriate and timely medical intervention
when necessary.  Thus, she has unique physical needs and faces unique dangers.  If
her trach were to become plugged, or if she or K.R. were to pull out her trach,
she could go into respiratory distress, and possibly die, within minutes.  Mother
was repeatedly informed of the dangers that S.R. faces and the need for Mother
to be appropriately trained and attentive so that S.R. would not be harmed, but
Mother did not take the action necessary to regain custody although it was made
available to her by the hospital and Department.  In contrast, the Department
plans to place S.R. for adoption, and two witnesses reported that several
people had expressed interest in adopting S.R.

          Mother
was nineteen at the time of trial and has two other children.  She also lives
in a home that is not appropriate for S.R., and although Mother testified that
she would like to access a larger place through public assistance, she has not
taken the steps necessary to accomplish that goal.  Mother has only been
employed once in her life, and that job lasted only eight days.  J.R. is
available to assist Mother with her children and finances, but returning S.R.
to Mother would present additional challenges unique to S.R. that are
complicated by also having Mother’s other children in the same home.

          While
many of Mother’s hardships are attributable to her impoverishment and were
compounded by her third pregnancy (such as her inability to freely travel to
the hospital and visitations and her lack of employment), Mother did not take
action to avail herself of the services offered to her by the hospital, the
Department, and governmental authorities that might have helped her gravitate
toward better living conditions appropriate for S.R.  See generally In re
T.T.F., 331 S.W.3d 461, 483–84 (Tex. App.—Fort Worth 2010, no pet.)
(discussing parent’s conduct, not best interest, but noting the difference
between impoverishment and failure to avail herself of available resources). 
At the time of trial, however, S.R. would, if returned to Mother, live with as
many as five other people in a one-room, twelve foot by twelve foot apartment
without a working refrigerator or way of cooking food other than by microwave.  As
with the endangerment ground discussed above, the jury unquestionably heard
conflicting evidence but could have determined that termination of Mother’s
parental rights is in S.R.’s best interest.

          Viewing
the evidence in the light most favorable to the verdict, we conclude that the
evidence is such that the factfinder could reasonably form a firm belief or
conviction that termination of Mother’s parental rights is in S.R.’s best
interest.  See J.P.B., 180 S.W.3d at 573.  We also conclude, viewing all
the evidence in a neutral light, that the factfinder could reasonably form a
firm conviction or belief that termination is in S.R.’s best interest.  See
H.R.M., 209 S.W.3d at 108.  We therefore hold that the evidence of S.R.’s
best interest is legally and factually sufficient to support the judgment, and
we overrule the remainder of Mother’s first issue.

VII. 
Mother’s Remaining Issues

A. 
Alleged Violation of Constitutional Rights

          Mother
argues in her second issue that termination of her parental rights under the
circumstances of this case violates her constitutional right to due process
under the Fourteenth Amendment to the United States Constitution.[15]
 Specifically, Mother argues that termination of her parental rights under the
facts of this case would violate her due process rights because

[i]t is impossible to
ignore that the harsh and irrevocable remedy of termination of [Mother]’s
parental rights was imposed not because of parental conduct but due to her
young age, lack of intelligence (in the form of her perceived inability to
quickly grasp specialized medical skills), and her lack of financial resources,
criteria that do not justify termination under Texas law.

Mother’s
argument, however, assumes that termination of her parental rights to S.R. was
based solely on a determination that termination would be in S.R.’s best
interest[16] and ignores that the
Department presented clear and convincing evidence that supports the jury’s
determination that Mother engaged in conduct that endangered S.R.’s physical or
emotional well-being.  See Tex. Fam. Code Ann. § 161.001(1)(E).

          The
Texas Supreme Court has held that “[d]ue process requires the application of
the clear and convincing evidence standard of proof in parental termination
cases.”  J.F.C., 96 S.W.3d at 263.  In that regard, the family code
requires that there be clear and convincing evidence that the parent committed
one or more of the acts specifically set forth in family code section
161.001(1) and that termination is in the child’s best interest.  See Tex.
Fam. Code Ann. §§ 161.001, .206(a).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Boyd, 727 S.W.2d at 533.  And Texas
courts have repeatedly stated that the family code codifies the due process
standard.  See, e.g., Perez v. Tex. Dep’t of Protective &
Regulatory Servs., 148 S.W.3d 427, 432 (Tex. App.—El Paso 2004, no pet.) (“Codifying
the constitutional requirement, the Family Code provides that the burden of
proof in termination cases is clear and convincing evidence.”).  Courts have
also held that while a parent’s rights are of constitutional magnitude, they
are not absolute.  See C.H., 89 S.W.3d at 26.

          Given
our holdings above that there is legally and factually sufficient evidence
under the clear and convincing evidence standard that Mother engaged in conduct
that endangered S.R.’s physical or emotional well-being and that Mother did not
take the steps to avail herself of the services offered to her by the hospital,
the Department, and governmental authorities that might have helped her learn
to appropriately care for S.R.’s medical needs and gravitate toward better
living conditions appropriate for S.R., we hold that termination of Mother’s
parental rights to S.R. was not based solely on Mother’s youth, impoverishment,
or alleged lack of intelligence and that it was instead based on sufficient,
clear and convincing evidence as required by the family code and the Due
Process Clause of the United States Constitution.  Thus, under the
circumstances of this case, the termination of Mother’s parental rights to S.R.
does not violate Mother’s due process rights, and we overrule Mother’s second
issue.

B. 
Appointment of the Department as Managing Conservator

          In
her third issue, Mother argues that the trial court erred by appointing the
Department as S.R.’s managing conservator.  Her third issue, however, is
contingent upon success on her first issue.  See In re D.N.C., 252
S.W.3d 317, 318 (Tex. 2008); Melton v. Tex. Dep’t of Fam. & Protective
Servs., No. 03-08-00168-CV, 2010 WL 668917, at *11 (Tex. App.—Austin Feb.
25, 2010, no pet.) (mem. op.).  Because we overruled her first issue, we
likewise overrule her third issue.

VIII. 
Conclusion

          Having
overruled each of Mother’s issues, we affirm the trial court’s judgment.

 

 

ANNE GARDNER

JUSTICE

 

PANEL: 
GARDNER,
WALKER, and MCCOY, JJ.

 

DELIVERED:  September 27,
2012










 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-11-00153-CV

 

 


 
 
 In
 Interest of S.R., A Child
  
  
  
  
  
  
 
 
 §
  
 §
  
 §
  
 §
  
  
 
 
 From the 355th District
 Court
  
 of
 Hood County (D2010080)
  
 September
 27, 2012
  
 Opinion
 by Justice Gardner
 
 


 

JUDGMENT ON REHEARING

 

After
reviewing Appellant A.R.’s motion for rehearing, we deny the motion.  We
withdraw our July 26, 2012 opinion and judgment and substitute the following.

This
court has again considered the record on appeal in this case and holds that
there was no error in the trial court’s judgment.  It is ordered that the
judgment of the trial court is affirmed.

 

SECOND DISTRICT COURT OF APPEALS 

 

 

 

By_________________________________

   
Justice Anne Gardner








 

 









[1]See Tex. R. App. P.
47.4(b).





[2]S.R.’s presumed father,
R.G., did not appear for trial, and his parental rights were terminated.  R.G.
is not a party to this appeal.





[3]Trach is short for
tracheostomy.





[4]Cozart acknowledged having
not personally prepared the calendar and testified that it was possible that
Mother was at the hospital on dates where the calendar reflected otherwise.





[5]S.R.’s nurse and S.R.’s
court-appointed special advocate each testified that “several” people had
expressed interest in adopting S.R., but Cook agreed that adoptive placements
at this point are speculative and that there is no guarantee S.R. would be
adopted.





[6]Farquhar testified that
Mother “had one job and [was] let go after about a week.”





[7]Foster said that Mother
had always taken pictures, but this was the first visit that her youngest child
attended, so she wanted pictures of all her children together.





[8]Portions of the video were
played for the jury.





[9]Family code section
161.001(1)(E) states in full that termination of parental rights may be ordered
if there is clear and convincing evidence that the parent “engaged in conduct or
knowingly placed the child with persons who engaged in conduct which
endangers the physical or emotional well-being of the child.”  Tex. Fam. Code
Ann. § 161.001(1)(E) (West Supp. 2012) (emphasis added).  However, the trial
court granted Mother a directed verdict concerning her knowing placement of
S.R. with others who had engaged in endangering conduct and thus did not
instruct the jury as to that portion of section 161.001(1)(E).





[10]Section 263.405(i) was
repealed effective September 1, 2011, but it technically applies in this case
because the trial court signed the judgment before September 1, 2011.  Litigants
whose parental rights are terminated by final orders rendered on or after that
date need no longer file statements of points.





[11]Mother preserved this
part of her first issue by raising it in her first motion for new trial.





[12]We recognize that the
supreme court disapproved of J.O.C. for its “articulation of the
standard of review on appeal.”  J.F.C., 96 S.W.3d at 267 & n.39. 
The supreme court did not otherwise disapprove of J.O.C., however, and
we believe that the evidence in J.O.C. was nevertheless sufficient under
the properly articulated standard of review.





[13]Along with a best
interest finding, a finding of only one ground alleged under section 161.001(1)
is sufficient to support a judgment of termination.  In re E.M.N., 221
S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).  We thus need not address
the sufficiency of the evidence under section 161.001(1)(O).  See id.; see
also Tex. R. App. P. 47.1.





[14]The Department argues
that Mother has not preserved her legal and factual sufficiency challenges to
the best interest ground.  We, however, do not read Mother’s first, timely
motion for new trial as narrowly as the Department.  We thus decline the
Department’s invitation to find waiver under these circumstances.  See T.O.
Stanley Boot Co., Inc. v. Bank of El Paso, 847 S.W.2d 218, 220 (Tex. 1992)
(listing five ways to preserve a legal sufficiency challenge); see also
Tex. R. Civ. P. 324(b)(2) (requiring a motion for new trial to preserve
complaint that evidence is factually insufficient).





[15]Mother preserved her
second issue by raising it in her second motion for new trial.  Although the
trial court had, at the time Mother filed her second motion for new trial,
previously denied her first motion for new trial, Mother’s second motion for
new trial was filed within thirty days of the trial court’s judgment and sought
additional modification of the trial court’s judgment, meaning that it is a
permissible avenue to preserve complaints for appeal in that the substantive
content of the second motion for new trial qualifies as a motion to modify,
correct, or reform the judgment under rule of civil procedure 329b.  See In
re Brookshire Grocery Co., 250 S.W.3d 66, 69–70, 72 (Tex. 2008) (orig.
proceeding); see also Tex. R. Civ. P. 329b.  Specifically, the Brookshire
court held that “a party whose motion for new trial is overruled within thirty
days of judgment may still file a motion to modify, correct, or reform the
judgment—provided it is filed within thirty days of judgment—and thereby extend
the trial court’s plenary power.”  250 S.W.3d at 72; see Tex. R. Civ. P.
329b(e), (g).





[16]For example, Mother cites
Clay v. Tex. Dep’t of Human Resources, 748 S.W.2d 598, 601 (Tex.
App.—Waco 1988, no writ); and In re R.E.W., 545 S.W.2d 573, 582 (Tex.
Civ. App.—Houston [1st Dist.] 1976, writ ref’d n.r.e.) (both holding that
termination of the parent-child relationship may not be based only on the
child’s best interest and that there was insufficient evidence of statutory
endangerment).